**NIAGARA MOHAWK POWER CORPORATION,**
Plaintiff,

**New York State Electric & Gas Corporation, Plaintiff–Intervenor,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, New York State Public Service Commission, Harold A. Jerry, Jr., Lisa Rosenblum, William D. Cotter, Raymond J. O'Connor and John F. O'Mara, Defendants,**

**Independent Power Producers of New York, Inc., Defendant–Intervenor.**

No. 95–CV–634.

United States District Court, N.D. New York.

Aug. 27, 2001.

Michael W. Murphy, Niagara Mohawk Power Corporation, Syracuse, New York,

Edward Berlin, Robert V. Zener, Swidler Berlin Shereff Friedman, L.L.P., Washington, D.C., for plaintiff.

Richard M. Lorenzo, Jonathan D. Schneider, Huber Lawrence & Abell, New York City, for plaintiff-intervenor.

Monique Penn–Jenkins, Federal Energy Regulatory Commission, Washington, D.C., Lawrence G. Malone, Jonathan D. Feinberg, Public Service Commission of the State of New York, Albany, New York, Howard S. Read, David B. Johnson, Read and Laniado, Albany, New York, for defendant-intervenor.

## MEMORANDUM—DECISION AND ORDER

MORDUE, District Judge.

### I. Introduction

The present matter arises in substantial part from the Public Utilities Regulatory Policies Act ("PURPA"), codified at 16 U.S.C. § 824a–3. PURPA was intended by Congress to promote long-term economic growth by reducing the nation's reliance on oil and gas, to encourage the development of alternative energy sources and thereby to combat a nationwide energy crisis. Section 210(a) of PURPA required the Federal Power Commission ("FPC"), now known as the Federal Energy Regulatory Commission ("FERC"), to "prescribe, and from time to time thereafter revise" rules requiring electric utilities to offer both to sell and purchase electric energy from qualifying cogeneration facilities ("QFs").[1] 16 U.S.C. § 824a–3(a).

---

1. A qualifying cogeneration facility is defined by PURPA as a small power production facility of "not more than 80 megawatt ("MW") capacity," 16 U.S.C. § 824a–3(a), which produces electric energy primarily by use of solar or wind energy, waste or geothermal re-sources and is owned by a person "not primarily engaged in the generation or sale of electric power (other than electric power solely from cogeneration facilities or small power production facilities)." 16 U.S.C. § 796(17)(A)–(E).

Section 210(b) of PURPA required that the rates utilities paid for power purchased from QFs be "just and reasonable to the electric consumers" and "not discriminate" against QFs. 16 U.S.C. § 824a–3(b). Finally, in Section 210(e), PURPA exempted QFs from federal and state regulatory control in connection with rates and financial organization. *See* 16 U.S.C. § 824a–3(e).[2]

Section 210(b) of PURPA declares that "[n]o such rule [promulgated by FERC] ... shall provide for a rate which exceeds the incremental cost to the electric utility of alternative electric energy." 16 U.S.C. § 824a–3(b). The "incremental cost" to the electric utility of alternative electric energy is defined as "the cost to the electric utility of the electric energy which, but for the purchase from such cogenerator or small power producer, such utility would generate or purchase from another source." 16 U.S.C. § 824a–3(d). The in-

cremental cost described by Congress in PURPA is defined in the accompanying regulations as "avoided costs," or those costs which the utility "avoided" incurring itself by purchasing power from a QF. *See* 18 C.F.R. § 292.101(b)(6).[3]

In an effort to apply the tenets of PURPA to the states, Congress also directed that each state regulatory authority implement the rules prescribed by FERC pertaining to electric utilities' obligation to purchase power from QFs. *See* 16 U.S.C. § 824a–3(f).[4] Thus, in 1980, the New York State legislature enacted New York Public Service Law § 66–c, which provided that the defendant New York Public Service Commission ("PSC") would require state regulated electrical utilities to enter into long-term contracts, a/k/a power purchase agreements ("PPAs"), for the purchase of electricity from alternative energy sources, including cogeneration facilities. *See*

**2.** These requirements were based on Congress' identification of two problems which impeded the development of non-traditional generational facilities: 1) traditional electrical utilities were reluctant to purchase power from, and sell power to non-traditional facilities; and 2) regulation of non-traditional facilities by state and federal utility authorities imposed undue financial burdens on small alternative energy producers. *See FERC v. Mississippi*, 456 U.S. 742, 751, 102 S.Ct. 2126, 72 L.Ed.2d 532 (1982).

**3.** PURPA also contains an elaborate enforcement scheme and provisions for judicial review. *See* 16 U.S.C. § 824a–3(g)–(h). Section 210(g) provides for (1) state court review of state regulatory authorities' orders implementing PURPA; and (2) state court actions to enforce requirements of state regulatory authorities. *See* 16 U.S.C. § 824a–3(g)(1)–(2). Section 210(h)(1) provides that for enforcement purposes, rules and regulations promulgated pursuant to PURPA shall be treated like rules promulgated pursuant to the Federal Power Act ("FPA"), *see* 16 U.S.C. § 824a–3(h)(1), which are enforceable by FERC in federal district court. *See* 16 U.S.C. § 825m. The FPA grants FERC the authority to regu-

late the nationwide development of water and power resources, the transmission of electric energy in interstate commerce, the sale of such energy at wholesale in interstate commerce and the licensing and administration of public utilities. 16 U.S.C. § 791a *et seq* .. Section 210(h)(2)(A) of PURPA provides that FERC may bring an enforcement action against a state regulatory agency in district court, and Section 210(h)(2)(B) allows a utility or cogenerator to petition FERC to enforce Section 210(f) which governs state regulatory authorities' responsibilities to implement PURPA rules and regulations. *See* 16 U.S.C. § 824a–3(h)(2)(B). If FERC declines to bring such an enforcement action, the utility or cogenerator can commence its own enforcement action against the state regulatory authority in district court. *See id.*

**4.** Section 210(f)(1) of PURPA obligates state regulatory agencies to implement FERC's rules through their own rulemaking. Prior to the enactment of PURPA, FERC had exclusive authority to regulate wholesale power rates charged by utilities under the FPA. *See Arkansas Elec. Co-op. v. Arkansas Pub. Serv. Comm'n*, 461 U.S. 375, 381, 103 S.Ct. 1905, 76 L.Ed.2d 1 (1983).

N.Y.Pub.Serv.Law § 66–c. New York's definitions of a QF "overlapped aspects of the federal definitions, but [were] not identical thereto." *Consol. Edison Co. of New York, Inc. v. PSC ("Consol. Edison I")*, 98 A.D.2d 377, 380, 471 N.Y.S.2d 684 (3d Dep't 1983) (citing N.Y.Pub.Serv.Law § 2(2–a) and (2–b)). Generally, however, "those facilities that qualif[ied] under PURPA ... also qualif[ied] under the [Pub.Serv.Law.]" *Consol. Edison Co. of New York, Inc. v. PSC ("Consol. Edison II")*, 63 N.Y.2d 424, 432, 483 N.Y.S.2d 153, 472 N.E.2d 981 (1984). Furthermore, Section 66–c granted PSC authority to oversee the contracting process and set the purchase rate for long-term PPAs. *See id.*

The New York law did not adopt PURPA's "avoided cost" ceiling for purchases, however. In 1981, Section 66–c was amended to require PSC to establish a minimum sales price for power purchased from state qualifying QFs of at least six cents per kilowatt hour ("kwH"). *See* N.Y.L.1981, ch. 843, § 9. The amendment, commonly referred to as the "Six–Cent Law," did not apply to federally qualified QFs, but as referenced above, most entities qualified as QFs under state law also qualified under PURPA.

Effective July 24, 1992, New York's legislature once again amended § 66–c of the Public Service Law and partially repealed the Six–Cent Law. The amendment preserved the minimum rate, however, for:

any contract fully executed by the parties and filed with the [PSC] on or before [June 26, 1992] and (i) providing for the purchase of electricity at such minimum sales price; or (ii) providing for the purchase of electricity at a utility tariff rate referencing a statutory minimum sales price; or (iii) providing for the reconciliation or recalculation of such contract's purchase price by comparison to such statutory minimum sales price or tariff rate, for the duration of any such contract and performance thereunder, provided however, that such minimum sales price shall be implemented in accordance with the policies and conditions established by [PSC.]

N.Y.Pub.Serv.Law § 66–c(2) (McKinney 1996 Supp.). The amendment also "grandfathered" QFs which had obtained the legal right to receive the statutory minimum of six cents per kwH by way of a final, unappealable judgment of a New York State court prior to January 1, 1987. *See id.*

Plaintiff, Niagara Mohawk Power Corporation ("Niagara"), a traditional electrical utility, brings the present action principally to obtain relief from eleven long-term contracts [5] with various QFs, none of which are parties in this case. In each instance, Niagara's PPA requires it to pay for energy purchased from QFs at six cents per kwH as required by the N.Y.Pub.Serv. Law. According to Niagara, its payments under the eleven PPAs in question will significantly exceed its "avoided costs" by approximately $93 million over the terms of the agreements unless the contracts, or the orders and requirements on which they are based, are "revoked or revised to comply with federal law" which limits rates for QF purchases to a utility's "incremental" or avoided costs. *See* 16 U.S.C. § 824a–3(b).

## II. Procedural and Regulatory History

### A. *PURPA Regulations*

PURPA required FERC to prescribe regulations to implement the statute "[n]ot

---

**5.** Niagara's First Amended Complaint demands relief in connection with eighteen long-term QF contracts but seven of these were settled via a Stipulation and Order negotiated in connection with a Master Restructuring Agreement between Niagara and several Qfs, many of whom were at one time defendant-intervenors in this matter.

later than 1 year after November 9, 1978." 16 U.S.C. § 824a–3(a). Following public rulemaking proceedings, FERC promulgated regulations governing transactions between utilities and QFs in connection with purchase and sales of electricity. *See Small Power Prod. & Cogeneration Facilities, Regs. Implementing Section 210 of [PURPA]*, Order No. 69, 45 Fed.Reg. 12214 (Feb. 25, 1980). In *Am. Elec. Power Serv. Corp. v. FERC*, 675 F.2d 1226 (D.C.Cir.1982) *("AEP")*, four utilities challenged the legality of the very regulations at issue in this case. There, the court held that FERC failed to adequately explain or justify its adoption of the full avoided cost standard in light of the enabling statute, PURPA, which mandated that rates charged to consumers be reasonable and that rates paid to QFs not exceed utilities' incremental costs. *See AEP*, 675 F.2d at 1232. The plaintiff utilities in *AEP* argued that the "just and reasonable" language regarding purchase rates in Section 210(b) of PURPA required that rates be set at the lowest possible reasonable rate consistent with the maintenance of adequate service in the public interest. Although FERC could have enacted rules which required states to set PPA rates at less than avoided costs, FERC adopted "as a uniform rule, the maximum purchase rate specified in the statute," after concluding that the full avoided cost standard "would be just and reasonable in every case" as necessary to encourage cogeneration. *Id.* at 1233. The court found that FERC failed to adequately balance the interests of cogenerators, the public and consumers of electric utilities in rejecting, in an "across-the-board manner," PPA rates below full avoided costs. *Id.* at 1236.

In *Am. Paper Inst., Inc. v. Am. Elec. Power Serv. Corp.*, 461 U.S. 402, 103 S.Ct. 1921, 76 L.Ed.2d 22 (1983) *("API")*, the Supreme Court reversed, in part, the D.C. Circuit's determination that FERC had improperly promulgated its avoided cost rules. There, the Court found that FERC had fulfilled its obligation under PURPA to set a rate which was "in the public interest," because "the words 'public interest' in a regulatory statute ... take meaning from the purposes of the regulatory legislation." 461 U.S. at 417, 103 S.Ct. 1921 (quoting *Nat'l Assoc. for the Advancement of Colored People v. FPC*, 425 U.S. 662, 669, 96 S.Ct. 1806, 48 L.Ed.2d 284 (1976) *("NAACP v. FPC")*). The Court found that the primary purpose of PURPA was to encourage cogeneration and that the "just and reasonable to ... consumers" language of PURPA required FERC only to "consider[ ] ... potential rate savings for electric utility consumers." *Id.* at 415, n. 9, 103 S.Ct. 1921. In the Court's estimation, FERC did consider the possibility of such rate savings, but rejected a percentage-of-avoided-costs approach after determining that purchase rates set at below avoided costs might discourage QF production. *See id.* at 415, 103 S.Ct. 1921 (citing *Small Power Prod. & Cogeneration Facilities; Regs. Implementing Section 210 of [PURPA]*, Order No. 69, 45 Fed.Reg. at 12222–12223).

### B. *New York Legal and Administrative Proceedings*

PSC adopted rules to implement both PURPA and Section 66–c of the N.Y.Pub. Serv.Law in 1982. *See Consol. Edison Co. of New York, Inc.*, PSC Case No. 27574, Opinion No. 82–10, 48 P.U.R.4th 94 (May 12, 1982) (commonly referred to as "Opinion 82–10"). There, PSC set forth generic guidelines for calculation of a utility's avoided costs. PSC ordered all utilities to file estimated long-run avoided costs ("LRACs") a/k/a "buyback" tariffs designed to implement PURPA and N.Y.Pub. Serv.Law § 66–c. PSC further directed that New York utilities such as Consolidat-

ed Edison Company of New York, Inc. ("ConEd") must thereafter offer to purchase electric energy from QFs which were qualified under either PURPA or Section 66–c, or both, at a rate of least six cents per kwH. Opinion 82–10 also directed that QFs be paid the greater of the six-cent rate or the utility's avoided cost rate as set forth in its buyback tariffs.

ConEd challenged both PSC's requirement that it make purchases from QFs which only qualified under the Public Service Law and that it pay six cents per kwH pursuant to Article 78 of N.Y.Civ.Prac.L & R.. The utility argued that PURPA pre-empted the Six–Cent Law to the extent that it required utilities to pay more than its avoided costs for QF purchases. *See Consol. Edison I,* 98 A.D.2d at 380, 471 N.Y.S.2d 684.[6] ConEd also contended that the FPA pre-empted PSC from compelling utilities to purchase power from purely state qualifying QFs since FERC has exclusive jurisdiction over sale of energy at wholesale in interstate commerce.[7] Niagara participated in the case as *amicus curiae.* The Appellate Division reversed PSC's order which implemented the Six–Cent Law, finding it was contrary to and pre-empted by federal law insofar as it required purchases in excess of the avoided cost rate established by PURPA and FERC regulations. The court also modified PSC's determination by holding that New York could only require ConEd to make purchases from QFs which qualified under PURPA. In the court's estimation, the required purchase of electricity from purely state qualifying QFs fell impermissibly under the pre-emptive blanket of the FPA.

PSC filed an appeal of the Appellate Division's determination in *Consol. Edison I.* While awaiting decision by the Court of Appeals, PSC continued to direct utilities to sign contracts at the six-cent rate, but included provisions in said contracts to eliminate the statutory minimum if PSC lost on appeal. Niagara requested that one QF contract with Energy Oil, Inc., which was signed prior to the Appellate Division's decision in *Consol. Edison I,* but not forwarded for approval by PSC until after the notice of appeal was filed, be expressly conditioned on the outcome of the appeal. PSC declined to reformulate the contract but granted Niagara's request to obtain full recovery of the cost of the contract with Energy Oil, Inc. from its ratepayers. *See Niagara Mohawk Power Corp.'s Request for Approval of a Purchase Agreement with Energy Oil, Inc. & Full Recovery of Purchase Costs via the Fuel Adjustment Clause* (memorandum filed PSC session of March 28, 1984). Niagara did not appeal this order.

Following PSC's order that utilities file proposed purchase or "buyback" tariffs designed to implement PURPA and Public Service Law § 66–c in Opinion 82–10, Niagara proposed its buyback tariff which stated that QFs should be required to elect the statutory minimum of six cents per kwH should this rate exceed the utility's estimated LRACs. PSC rejected this proposal, reaffirming its directive in Opinion 82–10 that QFs be paid the higher of the two rates. *See On–Site Generation Proceeding—Niagara Mohawk Power Corp.'s Proposed Buyback Tariff (Order Concerning Proposed Tariff),* PSC Case No. 27574, 23 N.Y.P.S.C. 5204, 5227 (September 30, 1983). Niagara did not appeal this order.

---

**6.** The proceedings before the Appellate Division were held in abeyance for a time pending the outcome of *AEP, supra,* which as discussed above, ultimately upheld the validity of

FERC's PURPA rules. *See Consol. Edison I,* 98 A.D.2d at 379, 471 N.Y.S.2d 684.

**7.** *See supra* note 4.

PSC thereafter approved Niagara's estimated LRACs, *see Niagara Mohawk Power Corp.—Long–run Avoided Costs (Order Endorsing Settlement & Establishing Policy on Long–Run Avoided Costs)*, PSC Case No. 28793, 24 N.Y.P.S.C. 5583, 5590, 1984 WL 249063 (October 12, 1984), but stated that unless it lost the appeal of *Consol. Edison I*, Niagara's minimum QF contract rate would be six cents per kwH. Again Niagara did not appeal this order. Less than two weeks later, PSC did prevail when the Court of Appeals modified the Appellate Division order in *Consol. Edison II* finding that PURPA did not pre-empt PSC regulation requiring electric utilities to purchase power from federally qualifying QFs at a rate in excess of avoided cost. *See* 63 N.Y.2d at 433, 483 N.Y.S.2d 153, 472 N.E.2d 981. Essentially, the court determined after review of the statute's legislative history—particularly FERC's 1980 preamble to PURPA rules in which it suggested that states were free to impose rates in excess of avoided cost[8]—that PURPA's avoided cost ceiling was the maximum rate the *federal* government could require in the context of encouraging alternative power production. *See Consol. Edison II*, 63 N.Y.2d at 435, 483 N.Y.S.2d 153, 472 N.E.2d 981.

After determining that N.Y.Pub.Serv. Law § 66–c furthered, rather than hindered, PURPA's objective by enhancing the bargaining power of QFs through a guaranteed rate of six cents per kwH, the court rejected ConEd's argument that a second equally compelling objective of PURPA was to avoid consumer-ratepayer subsidies of QFs. *See id.* at 437, 483 N.Y.S.2d 153, 472 N.E.2d 981. Citing the Supreme Court's then recent decision in *API, supra*, the court held that the impact of the state-imposed rate on costs to consumer ratepayers was "but one factor that FERC was obliged to consider when it established avoided costs as the maximum rate to be imposed by Federal authorities."

**8.** Indeed, in the Preamble to its PURPA regulations, FERC left the states free to utilize their own means of encouraging alternate energy production, stating:

> The Commission has become aware that several States have enacted legislation requiring electric utilities in that State to purchase the electrical output of facilities ... at rates which may differ from the rates required under the Commission's rules implementing section 210 of PURPA.... This Commission has set the rate for purchases at a level which it believes appropriate to encourage cogeneration and small power production, as required by section 210 of PURPA. While the rules prescribed under section 210 of PURPA are subject to the statutory parameters, the States are free, under their own authority, to enact laws or regulations providing for rates which would result in even greater encouragement of these technologies. However, State laws or regulations which would provide rates lower than the federal standards would fail to provide the requisite encouragement to these technologies, and must yield to federal law. If a State program were to provide that electric utilities must purchase power from certain types of facilities, among which are included "qualifying facilities," at a rate higher than that provided by these rules, a qualifying facility might seek to obtain the benefits of that State program. In such a case, however, the higher rates would be based on State authority to establish such rates, and not on the Commission rules.
>
> The Commission finds no inconsistency in a facility's taking advantage of section 210 in order to obtain one of its benefits, while relying on other authority under which to buy from or sell to a utility.

*Small Power Prod. & Cogeneration Facilities; Regs. Implementing Section 210 of [PURPA]*, Order No. 69, 45 Fed.Reg. 12214, 12224, *Rates for Purchases–Relation to State Programs*, [FERC Statutes & Regs., Regs. Preambles] 1977–1981 ¶ 30,128, at 30,880 (1980), *order on reh'g*, FERC Statutes & Regs., Regs. Preambles 1977–1981 ¶ 30,160 (1980), *aff'd in part and vacated in part*, AEP, 675 F.2d 1226, *rev'd in part*, API, 461 U.S. 402, 103 S.Ct. 1921, 76 L.Ed.2d 22.

*Id.* The court noted the Supreme Court's acceptance of FERC's explanation that "it was more important that the rate 'provide a significant incentive for a higher growth rate' and that the resulting decreased reliance on fossil fuel would benefit ratepayers and the nation as a whole." *Id.* (citing *API,* 461 U.S. at 414, 103 S.Ct. 1921 (quoting *Small Power Prod. & Cogeneration Facilities; Regs. Implementing Section 210 of [PURPA],* Order No. 69, 45 Fed. Reg. at 12222)). The court then reasoned "[s]imilarly, while it is recognized that ratesavings may not be achieved for consumers under [the Six–Cent Law] because the ... per kilowatt hour rate may at times exceed current avoided costs, ... the rate does nevertheless further PURPA's objective because it encourages alternate energy production, and in a manner suited to the needs of this State." *Id.* at 438, 483 N.Y.S.2d 153, 472 N.E.2d 981.

Based on the foregoing, the Court of Appeals held that state regulation in the field was "not supplanted by PURPA but could be used to expand the federal PURPA-based incentives." *Id.* at 436, 483 N.Y.S.2d 153, 472 N.E.2d 981. In sum, the court held that PSC had the authority to require utilities to offer to purchase power from federally qualified QFs, including those that qualified under both PURPA and New York law, at a minimum rate of six cents per kwH in accordance with § 66–c of the Pub.Serv.Law. The court, however, did affirm the holding of the Appellate Division insofar as it deemed PSC regulations which required utilities to offer to purchase power from purely state qualifying QFs pre-empted by the FPA.[9]

PSC had argued that such sales were not pre-empted because the FPA only prohibits state regulation of "interstate" wholesale power transactions and sales from state QFs to state utilities remained purely intrastate. The court rejected this argument finding that a sale is in "interstate commerce" if the electric energy is "transmitted from a State and consumed at any point outside thereof." *Consol. Edison II,* 63 N.Y.2d at 439–40, 483 N.Y.S.2d 153, 472 N.E.2d 981 (citing 16 U.S.C. § 824(c)). The FPA was enacted to "fill the gap" left by the Supreme Court's decision in *Public Utils. Comm'n of Rhode Island v. Attleboro Steam & Elec. Co.,* 273 U.S. 83, 89–90, 47 S.Ct. 294, 71 L.Ed. 549 (1927), which held that states lacked power to regulate interstate sales of electricity at wholesale. *See id.* Rather, exclusive regulatory authority in this field was delegated to FERC under the FPA. *See id.* (citing *New England Power Co. v. New Hampshire,* 455 U.S. 331, 340, 102 S.Ct. 1096, 71 L.Ed.2d 188 (1982)). Based thereupon, the court determined that the FPA pre-empted any regulation by PSC of sales at wholesale in interstate commerce between a utility such as ConEd and purely state qualifying QFs. *See id.*

ConEd appealed the court's refusal to find pre-emption to the United States Supreme Court but the case was dismissed summarily for want of a substantial federal question. *See Consol. Edison Co. of New York, Inc. v. PSC ("Consol. Edison III"),* 470 U.S. 1075, 105 S.Ct. 1831, 85 L.Ed.2d 132 (1985). This was the only time Niagara sought judicial review of the constitutionality of the "Six–Cent Law."[10] Despite

---

**9.** Indeed, the court found that the FPA would also pre-empt New York's regulation of federal qualifying QFs in New York except that they are already exempt from the FPA pursuant to section 210(e) of PURPA. *See* 16 U.S.C. § 824a–3(e); 18 C.F.R. § 292.602. The purely state qualified QFs, however, are not

eligible for this federally authorized exemption because they are not covered by PURPA. Part II of the FPA applies "to the sale of electric energy at wholesale in interstate commerce." 16 U.S.C. § 824(b).

**10.** In two subsequent proceedings, Niagara challenged unsuccessfully the rates it was re-

its objections to paying what it considered to be an unlawful minimum rate, Niagara complied with several PSC orders between 1982 and 1992 which required it to pay more than its avoided costs for QF power purchases.[11] In lieu of appeal or challenge of these orders, Niagara was awarded, in most cases, the right to "pass through" the costs of these PPAs directly to its ratepayers.

## C. FERC Proceedings

On July 31, 1987, Orange and Rockland Utilities, Inc. ("O & R"), along with two other New York utilities, filed a petition with FERC for a declaratory order challenging the application of the Six–Cent Law to QF purchases. Niagara, along with Long Island Lighting Company ("LILCO"), intervened in this proceeding. In a decision which reversed its previous position as set forth in the 1980 preamble to PURPA regulations, FERC issued a prospective order on April 14, 1988, holding that in light of changes which had occurred in the industry since 1980, states thereafter could *not* impose any rate for sales by QFs to utilities in excess of avoided cost. *See Orange & Rockland Utils.,*

*Inc. ("O & R I")*, 43 F.E.R.C. ¶ 61,067, *reh'g denied,* 43 F.E.R.C. ¶ 61,546, 1988 WL 244978 (1988). However, on June 16, 1988, FERC stayed this prospective order, *see Orange & Rockland Utils., Inc. ("O & R II")*, 44 F.E.R.C. ¶ 61,546, 1988 WL 244978, *reh'g denied,* 44 F.E.R.C. ¶ 61,273, 1988 WL 245475 (1988), pending judicial review or completion of a then-pending rulemaking proceeding.[12] PSC, among others, appealed *O & R I* to the Second Circuit which held that judicial review was premature. *See Occidental Chem. Corp. v. FERC,* 869 F.2d 127, 129 (2d Cir.1989). Although the court found that FERC's decision in *O & R I* "created considerable uncertainty in the industry," it nevertheless determined that FERC had taken no final action which was ripe for review citing the June 16, 1988, order staying *O & R I* as well as the ongoing rulemaking proceeding. *See id.* at 128–29. Thus, the application of FERC's decision in *O & R I* remained in limbo.

On January 11, 1995, FERC issued *Connecticut Light & Power Co.,* 70 F.E.R.C. ¶ 61,012, 1995 WL 9931 (1995) *("CL & P I")*, another declaratory proceeding in which Niagara had intervened. There,

quired to pay QFs which were constructed or had begun facility construction prior to enactment of PURPA, *see Allied Chem. v. Niagara,* 72 N.Y.2d 271, 532 N.Y.S.2d 230, 528 N.E.2d 153 (1988), *cert. denied,* 488 U.S. 1005, 109 S.Ct. 785, 102 L.Ed.2d 777 (1989) and *Occidental Chem. Corp. v. PSC,* 114 A.D.2d 149, 499 N.Y.S.2d 214 (3d Dep't 1986), *lv. denied,* 68 N.Y.2d 608, 506 N.Y.S.2d 1033, 498 N.E.2d 435 (1986), but did not renew its claim that the Six–Cent Law was pre-empted by federal law or violated the Supremacy Clause.

**11.** Niagara appealed only one of these orders. In *Niagara v. PSC,* 137 Misc.2d 235, 520 N.Y.S.2d 122 (Sup.Ct.1987), *aff'd* 138 A.D.2d 63, 530 N.Y.S.2d 626 (3d Dep't 1988), the utility argued that PSC could not require it to pay the minimum statutory rate of six-cents

per kwH to out-of-state QFs, but did not challenge the lawfulness of the Six–Cent Law. Nevertheless, Niagara's petition for review was dismissed.

**12.** Indeed, on June 16, 1988, the same day that FERC stayed its April 14, 1988, order in *O & R I,* FERC issued a notice requesting supplemental comments on whether it should codify, in a final rule, the position FERC adopted in said order. *See Admin. Determination of Full Avoided Costs,* 53 Fed.Reg. 24099 (June 27, 1988), FERC Statutes and Regulations ¶ 32,462 (1988). The underlying rulemaking proceeding had been pending since March 1988, prior to issuance of *O & R I. See Admin. Determination of Full Avoided Costs, Sales of Power to Qualifying Facilities & Interconnection Facilities,* 53 Fed.Reg. 9331 (March 22, 1988).

FERC declared that a Connecticut statute, which, as applied, could require an electric utility such as Connecticut Light and Power Co. ("CL & P") to purchase power from certain types of QFs (resource recovery facilities owned or operated for the benefit of municipalities) at a rate above avoided cost, was pre-empted by PURPA. *See CL & P I*, 70 F.E.R.C., at 61,029, 1995 WL 9931. FERC rejected the argument that the preamble to its own rules and regulations under PURPA suggested that states could set rates above avoided costs. *See id.* Rather, FERC stated that the language of its 1980 preamble was unsupported by legal rationale or analysis and that it could not "ascertain at this date any legal basis under which states have independent authority to prescribe rates for sales by QFs at wholesale that exceed the avoided cost cap contained in PURPA." *Id.* Therefore, FERC held that the Connecticut statute, insofar as it would require rates in excess of avoided cost, was pre-empted. FERC determined that this result was "appropriately applied" to CL & P, because CL & P "ha[d] been challenging this rate since at least 1987." *Id.* FERC warned it would "not entertain requests as a result of this order asking us to invalidate on this basis other, pre-existing contracts where the avoided cost issue could have been raised. The appropriate time to challenge a state-imposed rate is up to or at the time the contract is signed, not several years into a contract which heretofore has been satisfactory to both parties." *Id.* Henceforth, however, FERC deter-

mined that contracts which were the product of state law or policy requiring PPA rates in excess of avoided costs would be void *ab initio*. *See id.*, at 61,030, 1995 WL 9931.

As referenced above, the New York legislature amended Public Service Law § 66–c in 1992 by partially repealing the Six–Cent Law. On the same day as it issued *CL & P I*, FERC filed *Orange & Rockland Utils., Inc.("O & R III")*, 70 F.E.R.C. ¶ 61,014, 1995 WL 9930 (1995), in which it dismissed as moot O & R's original petition (in which Niagara had intervened). There, FERC determined that its decision in *O & R I* had never become effective. To wit, FERC held that the April 14, 1988, order was not intended to apply retroactively and that it was almost immediately stayed by virtue of *O & R II* on June 16, 1988. "The prospective application of the April 14 order coupled with the stay of that order resulted in that order never having been made effective." *O & R III*, 70 F.E.R.C., at 61,034, 1995 WL 9930. As a further matter, "the statutory minimum six-cent rate which was the subject of the petition" was repealed. *Id.* FERC thus determined that O & R's petition had been "overtaken by subsequent events," was therefore moot and would be dismissed. *Id.*

On February 10, 1995, Niagara and LILCO petitioned FERC for rehearing of both *CL & P I* and *O & R III*.[13] In *CL & P II*, Niagara and LILCO objected to FERC's decision not to apply the holding

**13.** Although the parties in both cases styled their petitions as requesting a rehearing, FERC deemed them to request reconsideration. Citing *Indus. Cogenerators v. FERC*, 47 F.3d 1231 (D.C.Cir.1995) (holding that appellate courts have no jurisdiction to review nonbinding FERC orders interpreting its own regulations under Section 210 of PURPA), FERC concluded that "formal rehearings do not lie, either on a mandatory or a discretion-

ary basis, in cases that involve solely Section 210 [PURPA] issues." *Connecticut Light & Power Co. ("CL & P II")*, 71 F.E.R.C. ¶ 61,035, at 61,148 n. 2, 1995 WL 216783 (1995) and *Orange & Rockland Utils., Inc. ("O & R IV")*, 71 F.E.R.C. ¶ 61,034, at 61,144 n. 2, 1995 WL 216782 (1995). Thus, FERC, in its discretion, treated the petitions of Niagara and LILCO in both cases as requests for reconsideration. *See id.*

of *CL & P I* to other pre-existing contracts. On the other hand, several QFs objected to FERC's determination that Connecticut was pre-empted from imposing a PPA rate in excess of avoided costs for QF purchases. Indeed, the QFs argued *CL & P I* could not be applied to invalidate contracts reflecting the six-cent minimum rate required by N.Y.Pub.Serv. Law § 66–c because of the Supreme Court's dismissal in *Consol. Edison III* for lack of a federal question, which, they argued, was a bar to FERC's determination on the merits of the Six–Cent Law. *CL & P II*, 71 F.E.R.C., at 61,152, 1995 WL 216783. The QFs contended that the Supreme Court's dismissal in *Consol. Edison III* was tantamount to an endorsement of the New York Court of Appeals decision in *Consol. Edison II* which upheld the constitutionality of the Six–Cent Law.

FERC rejected this argument finding in the first instance that "[w]hile dismissal of an appeal for want of a substantial federal question is a decision on the merits of a particular case insofar as it leaves the underlying judgment undisturbed," it did not mean that FERC and all other subsequent courts were bound "for all time and in all cases by the New York Court of Appeals' interpretation of the meaning and reach of PURPA." *Id.* (citing *Washington v. Confederated Bands & Tribes of the Yakima Indian Nation*, 439 U.S. 463, 477 n. 20, 99 S.Ct. 740, 58 L.Ed.2d 740 (1979) (summary action by Supreme Court does not necessarily reflect agreement with the opinion of the court whose judgment is appealed); *Anderson v. Celebrezze*, 664 F.2d 554, 558–60 (6th Cir.1981) *aff'd in relevant part*, 460 U.S. 780, 784 n. 5, 103

S.Ct. 1564, 75 L.Ed.2d 547 (1983) (to reach any other conclusion would allow parties seeking Supreme Court review to control effect of Supreme Court's summary actions through careful structuring of appeals)). Rather, FERC determined that the Supreme Court's dismissal on jurisdictional grounds "went only to the specific challenges presented to the Supreme Court . . . only to what was necessary for the Supreme Court to decide the case; its reach went no further." *CL & P II*, 71 F.E.R.C., at 61,152–53, 1995 WL 216783 (citing *Anderson*, 460 U.S. at 785 n. 5, 103 S.Ct. 1564). Moreover, FERC held that the Court of Appeals' decision in *Consol. Edison II* relied to a great extent on the 1980 preamble to FERC's PURPA rules, a "predicate which has now been overturned." *Id.*

Insofar as the arguments by Niagara and LILCO regarding FERC's refusal to apply its pre-emption determination on the merits to parties and contracts not directly before it in *CL & P I*, FERC deemed its actions necessary to "avoid the substantial injustice that our determination on the merits in this proceeding might otherwise have created if applied to invalidate other, pre-existing QF contracts that [were] not involved in the present litigation." *Id.*, at 61,154, 1995 WL 9931.

This approach is especially appropriate here given the apparent confusion created by the language contained in the preamble to our regulations. The United States District Court for the District of Connecticut, which directed CL & P to put this matter before us,[14] for one,

**14.** As referenced by FERC in *CL & P I*, CL & P had been litigating the lawfulness of the rates in its state-imposed PPAs since 1987. After obtaining partial relief from the Connecticut Supreme Court regarding one aspect of its challenge—the rate that the municipal

QF in question could charge for power—CL & P brought an action for declaratory and injunctive relief in United States district court alleging that Connecticut's regulatory scheme for municipal resources recovery facilities was pre-empted by Section 210 of PURPA.

noted that in light of the language contained in the 1980 preamble to our regulations the law was "unsettled and conflicting." As a consequence, some states in reliance on this preamble language have required rates that were above avoided cost for QF sales at wholesale. We have now expressly ruled that that is impermissible, and thus have cleared up the confusion that, admittedly, the language of the Commission's 1980 preamble had a hand in creating. In light of the confusion that the preamble language created, we believe it inappropriate to entertain requests to invalidate other, pre-existing contracts where the avoided cost issue could have been raised but was not raised.

*Id.* Importantly, FERC suggested that Niagara was merely an interested participant in CL & P's challenge of a Connecticut statute rather than a party which had presented its own specific factual and legal challenge to application of the Six–Cent Law. Indeed, FERC noted that based on Niagara and LILCO's intervenor—as opposed to party—status, it had no knowledge of "precisely how many contracts and how many different projects" would be affected by its pre-emption challenge. *Id.,* at n. 43, 1995 WL 9931. FERC thus denied the petitions for reconsideration filed by Niagara and LILCO.

In *O & R IV,* both utilities objected to FERC's determination that the petition filed by O & R in 1987 was moot and asked FERC to deem contracts with QFs set at rates above avoided cost void *ab initio* or at least those entered since April 14, 1988. *See* 71 F.E.R.C., at 61,145, 1995 WL 216782. FERC denied both petitions emphasizing that its April 14, 1988, order in *O*

& R I was to be applied only on a prospective basis. *See id.,* at 61,146, 1988 WL 391404. Indeed, FERC deemed it "inappropriate at this date to agree to LILCO's and Niagara's requests and now make such a determination effective as to all pre-existing contracts." *Id.,* at 61,146–47, 1995 WL 9931. Niagara and LILCO relied on *CL & P I* in arguing that like the petitioner utility in that case, they had been challenging the Six–Cent Law since 1987 when O & R first filed its petition. Thus, the utilities contended that like the Connecticut statute, the Six–Cent Law should be found to be inconsistent with and pre-empted by PURPA.

FERC disagreed noting that it had expressly declined to extend its ruling in *CL & P I* to pre-existing contracts where the issue of pre-emption could have been raised but was not to avoid "substantial injustice." *Id.,* at 61,147, 1995 WL 9931. In fact, FERC noted that it reaffirmed this determination in *CL & P II* on reconsideration. While FERC acknowledged that the Six–Cent Law had been under challenge since 1987, it declined to afford Niagara and LILCO the same status it had extended to CL & P. FERC reasoned in the first instance that Niagara:

was and is only an intervenor in this proceeding. Niagara ... has never filed a separate petition seeking relief as to its own QF contracts. Moreover, since 1988, when [FERC] limited its order in this proceeding to future contracts, and then stayed the effectiveness of the order, Niagara ... has made no filing at [FERC] or, to our knowledge, initiated state or federal court litigation seeking to challenge the rates in its own QF contracts as violating the avoided cost

See *CL & P v. South Eastern Connecticut Reg'l Res. Recovery Auth.,* 822 F.Supp. 888, 891 (D.Conn.1993). There, the court deferred determination of the case on the merits holding

that the issue of whether the statute was so pre-empted should be referred to FERC under the doctrine of primary jurisdiction. *See id.*

requirement of PURPA. This contrasts starkly with the continuing effort by [CL & P] to challenge its contract in state court, in federal court and then at this Commission.

*Id.* Furthermore, FERC rejected the notion that Niagara and LILCO had relied justifiably on FERC's pre-emption determination in *O & R I* since that order was to apply only prospectively and its effectiveness was nevertheless almost immediately stayed. "For the Commission, at this late date, suddenly to act to invalidate existing contracts that expressly had not been invalidated by its earlier orders in this proceeding would not be consistent with the need to avoid substantial injustice to the parties to such contracts." *Id.*

### D. District of Columbia Circuit Decision

On April 12, 1995, Niagara petitioned the United States Court of Appeals, District of Columbia Circuit for review of FERC's: (1) refusal to apply its decision in *CL & P I* to all pre-existing contracts; and (2) its dismissal of O & R's petition as moot in *O & R III*. In *NYSEG v. FERC,* 117 F.3d 1473 (D.C.Cir.1997), the court dismissed Niagara's appeal for want of jurisdiction. FERC had argued therein that the challenged orders "d[id] nothing more than announce the interpretation of the PURPA upon which [it] would rely in an enforcement action.[15] The orders [did] not determine any factual question such as 'whether the rates ... do or do not exceed avoided cost.' Nor are they binding upon the district court in which any enforcement action might be pursued." 117 F.3d at 1487–88. FERC urged the court to adhere to its determination in *Indus. Cogen-*

erators v. FERC, 47 F.3d 1231 (D.C.Cir. 1995), that Congress did not confer jurisdiction upon federal courts of appeals to review a declaratory order in which FERC interprets PURPA. *See id.* at 1488.

Niagara countered that *Indus. Cogenerators* was inapposite since each of the orders which it challenged in *Niagara v. FERC* "announc[ed] a rule of general application and not [as in *Indus. Cogenerators* ], a decision limited to a specific set of facts." *Id.* To wit, Niagara argued "nothing in *Industrial Cogenerators* suggests that the procedure for judicial review must differ because FERC eventually decided to resolve the issue in a declaratory ruling rather than through a rulemaking." *Id.* Moreover, Niagara contended that the enforcement action urged by FERC as an adequate remedy was ill-suited for review of FERC's actions since such actions were aimed at non-compliant state commissions and could not be brought directly against FERC. *See id.*

The D.C. Circuit acknowledged that it had "expressly reserved" on the question of whether it had jurisdiction to review a FERC order promulgated under PURPA which announced a "rule of general application, not tied to a particular set of facts potentially subject to the statutory enforcement scheme." *Id.* (quoting *Indus. Cogenerators,* 47 F.3d at 1236.) While the court agreed with Niagara that "the orders ... at issue [did] announce a rule of general application," it answered the previously reserved question by concluding that Congress did *not* authorize it to review a FERC order announcing a rule of general application. *Id.*

---

**15.** Under PURPA, FERC may bring an enforcement action in federal district court against any state electrical regulatory authority which fails to implement FERC regulations designed to encourage cogeneration. *See* 16 U.S.C. § 824a–3(h)(2)(A). Alternatively, a utility or cogenerator may petition FERC to bring such an action and, if the agency declines, may itself sue the state regulatory authority in district court. *See* 16 U.S.C. § 824a–3(h)(2)(B).

An order that does no more than announce the Commission's interpretation of the PURPA or one of the agency's implementing regulations is of no legal moment unless and until a district court adopts that interpretation when called upon to enforce the PURPA. As a result, in the framework established by the Congress it is the district court that has been given the task of deciding in the first instance whether to adopt or reject a position advocated by the Commission. The courts of appeals accordingly do not have pre-enforcement jurisdiction to review a declaratory order that merely announces the position advocated by the FERC.

*Niagara v. FERC,* 117 F.3d at 1488 (citing *Indus. Cogenerators,* 47 F.3d at 1235).

In applying this rationale to the two orders of which Niagara sought judicial review, the court held:

The order issued by ... FERC in the *CL & P* [I] proceeding is, as we said of the order at issue in *Industrial Cogenerators,* "much like a memorandum of law"; it does "nothing more than state how the FERC interprets its own regulations." The district court in which CL & P's suit is pending may or may not decide to defer to the Commission's interpretation. Under the Administrative Procedure Act the district court must, of course, determine whether the Commission's interpretation of the statute is reasonable—but that task, contrary to petitioners' suggestion, the district court is perfectly capable of performing even if the Commission chooses not to intervene.

For the court of appeals to review the order at this juncture, could set up a quite unnecessary conflict; perhaps still worse, if in another case the district court were in the circuit where review of the declaratory order was sought, the appellate court's judgment would bind the district court and necessarily, therefore, oust that court from its role as the court of first instance in the enforcement scheme created of § 210. As we said in *Industrial Cogenerators,* the Congress cannot have intended that the courts of appeals review a declaratory order interpreting the PURPA when doing so would disrupt the elaborate enforcement scheme that the Congress created.

Orange and Rockland is no different. The Commission's declaratory order concerning the New York statute prescribing a six-cent rate had no legally binding effect; at most, it could have commanded some deference from a district court in a future enforcement action. Thus the petitioners ask us, when they petition for review of the order vacating the 1988 declaration, to review an order that "does nothing more than withdraw [an] ineffectual declaratory order." As we held in *Industrial Cogenerators,* we are without jurisdiction to do that.

*Id.* at 1488–89 (citing *Indus. Cogenerators,* 47 F.3d at 1235).

### E. *Niagara's Complaint and the Present Motions*

One month after it filed petitions for review of FERC's orders in *CL & P II* and *O & R III,* but well before the D.C. Circuit issued the above-referenced decision, Niagara filed the present complaint against FERC, PSC and the individual commissioners of the PSC which it amended in July 1995.[16] Thereafter, New York State

**16.** PSC moved to intervene as a party plaintiff and Independent Power Producers of New York also moved to intervene as a defendant.

By order dated February 25, 1998, then U.S. Magistrate Judge David N. Hurd denied these motions without prejudice subject to renewal

Electric and Gas Corporation ("NYSEG") moved and was granted leave to intervene as a plaintiff and several QFs [17] along with Independent Power Producers of New York, Inc. ("IPPNY"), a trade organization representing the interests of QFs statewide, later intervened as defendants. In lieu of serving answers to the amended complaint, all defendants moved to dismiss for lack of subject matter jurisdiction and failure to state a claim pursuant to Fed. R.Civ.P. 12(b)(1) and (6). After soliciting arguments from the parties as to whether she should recuse herself from determination of the case given her prior status as a PSC commissioner, and deciding that recusal was not required, then U.S. District Judge Rosemary S. Pooler (now a Circuit Judge for the Second Circuit Court of Appeals), to whom this matter was originally assigned, scheduled oral argument of defendants' motions for March 4, 1996.

FERC then moved to stay action in the case pending the above-referenced decision by the D.C. Circuit in *Niagara v. FERC* which motion Judge Pooler accepted on submittal following oral argument of defendants' dispositive motions. On April 15, 1997, Judge Pooler granted the motion to stay the action, pending determination of the D.C. Circuit's decision on Niagara's petitions for review. On July 11, 1997, the D.C. Circuit issued its decision in *Niagara v. FERC* as discussed above.

Niagara, IPPNY, and several QF intervenors thereafter moved jointly to again stay proceedings in the Northern District of New York after Niagara entered a contingent settlement agreement involving New York's governor, its legislature and

PSC ("the Master Restructuring Agreement") designed to restructure or terminate some of its PPAs with QFs. This Agreement was expected to resolve many of the issues in Niagara's lawsuit against several of the parties. Based thereupon, Judge Pooler issued an order staying the action until April 15, 1998. In April 1998, Judge Pooler extended the stay to July 15, 1998, in view of lingering uncertainty as to the closing date of the Master Restructuring Agreement. Finally, on July 10, 1998, Judge Pooler signed a Stipulated Order executed by all of the parties whereby Niagara's claims against all intervening defendant QFs were dismissed. However, Niagara's claims regarding those six-cent PPAs which were not affected by the Master Restructuring Agreement were preserved. Thereafter, Niagara requested that in view of expiration of the longstanding stay, the Court decide the pending motions to dismiss.

### F. *Niagara's Present Claims*

◼ In the first count of the amended complaint, Niagara alleges that PSC's orders which implemented New York's Six–Cent Law constitute state regulation of the wholesale sale of electric power, an area pre-empted by the FPA. Furthermore, Niagara alleges that the Six–Cent Law and PSC's implementation of same: (1) violate PURPA and its implementing rules; and (2) violate the Supremacy Clause of the United States Constitution. In the second cause of action, Niagara asserts that FERC's decision to refuse to apply the avoided cost limitation of PURPA and its own regulations to Niagara's existing six-

---

upon this Court's determination of the parties' dispositive motions.

**17.** The intervening QFs were as follows: Power City Partners, L.P., Ag–Energy, L.P., Seneca Power Partners, L.P., Sterling Power Partners, L.P., P & N Partners, L.P., Onondaga

Cogeneration Limited Partnership, Project Orange Associates, L.P., United Development Group–Niagara, L.P., American Ref–Fuel Company, and Cogen Energy Technology, L.P.

cent PPAs was arbitrary, capricious, an abuse of discretion, not in accordance with law, in excess of statutory authority and otherwise violative of the Administrative Procedure Act ("APA").[18] Niagara further contends that FERC's action or inaction herein violates PURPA's incremental cost limitation.

In a letter dated August 20, 1998, Niagara's counsel advised the Court that after reviewing the remaining eleven six-cent contracts to which it is a party, which represent some 78 MWs of capacity, the utility believes it will pay approximately $93 million more than current estimates of its LRACs over the life of the agreements. While acknowledging that this figure is considerably less than the sum at stake prior to execution of the Master Restructuring Agreement, Niagara contended that the amount of money still at issue is nevertheless "substantial," compelling it to proceed with the case.[19]

## III. Discussion

### A. *Applicable Legal Standard*

In addressing defendants' motions for dismissal pursuant to Fed.R.Civ.P. 12(b)(1) and (6), the Court accepts as true all factual allegations in the amended complaint and draws all inferences from those allegations in the light most favorable to Niagara. *See Albright v. Oliver,* 510 U.S. 266, 268, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994); *McEvoy v. Spencer,* 124 F.3d 92, 95 (2d

Cir.1997). Dismissal is proper only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), *accord Valmonte v. Bane,* 18 F.3d 992, 998 (2d Cir. 1994).

### B. *Motions to Dismiss the Claims against FERC*

### 1. *Claims Pursuant to PURPA*

■ FERC asserts Niagara's claim against it based on Section 210 of PURPA must be dismissed pursuant to Fed. R.Civ.P. 12(b)(6) for failure to state a claim. Nowhere in the complaint does Niagara state its legal grounds for proceeding against FERC based directly on PURPA. Indeed, its pleading simply alleges that "FERC's refusal to apply the incremental and avoided cost limitations of PURPA and its regulations under PURPA to Niagara's existing QF contracts constitutes a violation of the incremental cost limitation of PURPA." *See* First Amended Complaint ¶ 38 (citing 16 U.S.C. §§ 824a–3(b), (d)). The former section of course provides that rates for QF purchases should not exceed a utility's "incremental" or avoided costs while the latter provision simply defines incremental costs. Neither section provides a private right of action for a party aggrieved by FERC's alleged failure to implement these statutory guidelines.

---

**18.** The APA, codified at 5 U.S.C. § 551 *et seq.,* prescribes procedures by which federal agencies may promulgate rules and make adjudicative determinations. The APA also establishes a right to judicial review of such rulemaking and agency decisions:

> A person suffering a legal wrong because of agency action, or adversely aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.

5 U.S.C. § 702. The APA serves as a default mechanism for review in instances where review procedures are not specified in a governing statute. *See Bowen v. Massachusetts,* 487 U.S. 879, 903, 108 S.Ct. 2722, 101 L.Ed.2d 749 (1988) ("Congress did not intend the general grant of review in the APA to duplicate existing [statutory] procedures for review of agency action.")

**19.** Niagara has not, to the Court's knowledge, served or filed a second amended complaint.

The only right of action which appears in PURPA belongs, in the first instance, to FERC. Subsection (A) of PURPA Section 210(h)(2) authorizes FERC to *enforce* state implementation of its regulations against a non-compliant state regulatory authority or non-regulated utility in district court while subsection (B) allows an electric utility or QF to *petition FERC* to commence such an action. Only if FERC declines to do so, may the utility or QF commence its own action to force a state agency or non-regulated utility to comply with FERC's regulations. *See* 16 U.S.C. § 824a–3(h)(2). Here, without citing Section 210(h) of PURPA in its complaint or alleging that it has satisfied the administrative pre-requisite of petitioning FERC to commence an enforcement action, Niagara sues FERC itself for failure to comply with PURPA's rate cap. As referenced above, however, the "enforcement" contemplated under the statute is of FERC regulations against non-compliant state commissions. *See* 16 U.S.C. § 824a–3(f), (h).[20] Niagara "turns PURPA inside out by seeking to enforce the statute's alleged rate cap against FERC," *see NYSEG v. Saranac Power Partners, L.P.*, 117 F.Supp.2d 211, 255 (N.D.N.Y.2000).[21] Indeed, Niagara admits in its memorandum of law in opposition to defendants' motions that an enforcement action under Section 210 of PURPA against PSC "does not bring FERC itself into court." Thus, to the extent that Niagara's complaint suggests it is prosecuting its claim against FERC pursuant to PURPA, though the utility appears to have disavowed this avenue of relief in favor of APA review, it must be dismissed.

## 2. Claims Pursuant to the APA

### a. Failure to State a Claim

■ The Court agrees with defendants that because no statute clearly provides a right of review of FERC decisions interpreting PURPA, no such right exists under the APA unless Niagara demonstrates it has no other adequate remedy at law.[22] Defendants argue that PURPA's elaborate enforcement scheme and Niagara's statutory right to sue PSC pursuant to Section 210(h) of PURPA is an adequate alternative remedy thus precluding judicial review. Niagara counters that it cannot get full satisfaction by suing PSC alone. To wit, it contends that "FERC's presence as a defendant is necessary when judicial review of a FERC ruling is at issue." Memorandum of Law of Niagara in Opposition to Motions to Dismiss ("Niagara Brief"), p. 5.

**20.** To the extent that Niagara contends its PURPA claim against FERC is something other than an enforcement action, there is no legal authority which provides a basis for enforcing Section 210 of PURPA "in general" against FERC.

**21.** This Court dealt extensively with many of the legal issues presented in this case or issues closely related thereto in *NYSEG*, as cited herein. There, NYSEG, another traditional New York utility sued FERC and PSC along with two QFs with which it had been required to enter long-term PPAs pursuant to N.Y.Pub.Serv.Law § 66–c alleging that the failure and/or refusal of FERC and PSC to offer it relief from these contracts was viola-tive of PURPA and the APA since the rates in said contracts were expected to exceed NYSEG's estimated LRACs by over $3 billion. Because *NYSEG* involved many of the same parties, indeed, many of the same attorneys, as the present litigation, the Court assumes familiarity with the facts and legal analysis set forth therein and need not repeat them at length for purposes of the present opinion.

**22.** The APA contemplates judicial review of "agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704; *see also Bowen*, 487 U.S. at 903, 108 S.Ct. 2722.

However, as discussed above, subsequent to the filing of the present motions, the D.C. Circuit ruled in this very case, that FERC is *not* a necessary party to an enforcement action even where a district court is called upon to review the reasonableness or applicability of a regulatory interpretation by the agency. *See Niagara v. FERC,* 117 F.3d at 1488 ("[D]istrict court is perfectly capable of ... determin[ing] whether [FERC's] interpretation of [PURPA] is reasonable ... even if [FERC] chooses not to intervene."). Thus, to the extent that the D.C. Circuit's decision in *Industrial Cogenerators, supra,* left any doubt about the adequacy of PURPA's enforcement scheme in addressing Niagara's claims in this case, its decision in *Niagara v. FERC* erased it. Since Niagara is capable of obtaining complete relief in the context of its PURPA Section 210(h) enforcement action against PSC wherein this Court is fully equipped to accept or reject FERC's interpretation of PURPA and its regulations in *CL & P I* and *O & R III,* Niagara has no right to APA review of these orders. *See New York City Employees' Retirement Sys. ("NYCERS") v. Sec. & Exchange Comm'n ("SEC"),* 45 F.3d 7, 14 (2d Cir.1995) (litigants with remedies against parties other than administrative agency which rendered adverse determination are not entitled to APA review of said agency's action); *Marlow v. U.S. Dep't of Educ.,* 820 F.2d 581, 583 (2d Cir.1987).[23]

Even if this was not true, defendants point out that the controversial orders were merely non-enforcement determinations—that is, FERC elected not to apply its retroactive pre-emption analysis to other parties and contracts not directly before it in *CL & P I* and *O & R III,* even in the face of clear evidence that other QF contracts in those cases called for rates in excess of the avoided cost ceiling set forth in PURPA. According to defendants, the orders are thus unreviewable as a matter of law pursuant to *Heckler v. Chaney. See* 470 U.S. 821, 831, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985) (federal agency's decision not to prosecute or enforce rules and regulations is presumptively unreviewable under the APA).[24] There, the Supreme Court stated that "an agency generally cannot act against each technical violation of the statute it is charged with enforcing." 470 U.S. at 831, 105 S.Ct. 1649. Niagara does not even attempt to rebut the presumption of unreviewability by demonstrating that PURPA contains "meaningful standards" by which FERC's refusal to

---

**23.** In *Marlow,* a disabled school teacher filed an administrative complaint with the federal Education Department alleging discriminatory failure to hire by the New York City Board of Education Examiners in violation of the federal Rehabilitation Act. 820 F.2d at 581. The Regional Office for Civil Rights ("OCR") later determined that plaintiff was not "otherwise qualified handicapped person" within meaning of the Act because no reasonable accommodation could be made to allow plaintiff, who suffered from a psychiatric disorder, to perform the essential functions of the teaching job. *See id.* The court found that plaintiff's suit for review of OCR's determination under the APA was barred because the APA restricts judicial review to those agency actions for which "there is no other adequate remedy in court" and plaintiff could

have sued the Board directly under the Rehabilitation Act. *See id* at 583, n. 3.

**24.** This presumption can be rebutted if the substantive statute contains guidelines for the agency to follow in exercising its enforcement powers. *Heckler v. Chaney,* 470 U.S. at 833, 105 S.Ct. 1649. To wit, if Congress has provided meaningful standards for measuring the limits of the agency's discretion, there is "law to apply" under Section 701(a)(2) of the APA and "courts may require the agency follow that law." *Id.* at 834–35, 105 S.Ct. 1649. Otherwise, an agency's decision to not pursue an enforcement action is presumptively unreviewable as "committed to agency discretion by law." *Id.* at 835, 105 S.Ct. 1649.

apply its reasoning in *CL & P I* to Niagara's contracts can be measured.[25] Instead, it argues that the presumption of unreviewability does not bar its APA claim against FERC for two reasons. First, the utility contends that it is not challenging a decision "not to prosecute" by FERC. Rather, Niagara argues that it challenges FERC's ruling concerning the application of the avoided cost rule to existing contracts.[26] In either case, however, the inquiry focuses on FERC's refusal to take action it is allegedly required to take pursuant to PURPA, a matter reserved to the agency's remedial discretion and not reviewable under the APA. *See Heckler v. Chaney*, 470 U.S. at 831, 105 S.Ct. 1649. Thus, the Court rejects Niagara's attempt to couch its claim as something other than challenging a non-enforcement decision by FERC.

In a related argument which forecasted to some extent the D.C. Circuit's earlier

determination in this case that "the orders here at issue do announce a rule of general application," *Niagara v. FERC*, 117 F.3d at 1488, Niagara contends that the FERC orders under challenge are not just decisions "concerning the allocation of enforcement resources that *Heckler* shields from judicial review." Rather, Niagara asserts these orders announced rules of general applicability which "have to do with the substantive requirements of the law."[27] Importantly, however, in spite of this argument, Niagara does not challenge in any respect the legal conclusions reached by FERC in *CL & P I* regarding the "substantive requirements of the law." Indeed, Niagara agrees wholeheartedly with FERC's determination that PURPA preempts states from imposing QF contract rates in excess of a utility's avoided costs. The only thing Niagara objects to is FERC's refusal to apply this holding to its

**25.** Indeed, this Court has previously held that the opposite is true. "PURPA is not self-implementing, it is a 'regulatory statute,' *see NYSEG*, 117 F.Supp.2d at 231 (quoting *API*, 461 U.S. at 417, 103 S.Ct. 1921) which takes meaning and authority from its attendant regulations." *Id.* (citing *Chevron U.S.A., Inc. v. Natural Res. Defense Council*, 467 U.S. 837, 843–44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) ("The power of an administrative agency to administer a congressionally created ... program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress." In such case "there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute.")). "Because Congress merely announced the goal of promoting the development of alternative energy sources in PURPA and left the details of how to do so to FERC, it cannot be said that PURPA provides 'meaningful standards for defining the limits' of FERC's enforcement discretion." *Id.* (quoting *Heckler v. Chaney*, 470 U.S. at 834, 105 S.Ct. 1649.)

**26.** The Court is unable to discern a meaningful distinction between FERC's alleged failure to apply the avoided cost rate cap to Niagara's QF contracts, wherein the rates were unquestionably higher, and a decision by FERC "not to prosecute" or take action with respect to flagrant PURPA violations.

**27.** Although the D.C. Circuit suggested in *dicta* that "[u]nder the [APA] the district court must, of course, determine whether [FERC's] interpretation of [PURPA] is reasonable," *id.*, this Court disagrees. Such a suggestion flies directly in the face of the balance of the court's opinion which expressly rejected Niagara's contention that a PURPA Section 210 enforcement action against PSC was not an adequate remedy for challenging the legally binding effect of FERC's orders in *CL & P I* and *O & R IV*. As discussed above, if Niagara has an adequate remedy in PURPA against PSC, it cannot also sue FERC pursuant to the APA. However, even if the Circuit court "assumed" that APA review would properly lie in district court under these circumstances, the assumption of a jurisdictional basis where none lies is legally insignificant.

existing QF contracts, thereby invalidating them.[28] As such, Niagara challenges nothing more than FERC's alleged failure to "enforce" PURPA's rate cap in the context of its QF contracts, a decision which is presumptively unreviewable. Its reliance therefore on *Edison Elec. Inst. v. U.S. Envtl. Prot. Agency* ("EPA"), 996 F.2d 326 (D.C.Cir.1993) is inapposite.[29]

█ Even if the presence of an adequate remedy against a party other than FERC and the Court's conclusion that FERC's orders herein are nothing more than non-enforcement decisions do not preclude APA review, Niagara has still failed to allege an adequate claim against FERC under the APA. Under the APA, a

party "aggrieved" by an agency must show the agency's action was "arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). It is true that generally, agency "rule[s]" must be subjected to a notice and comment period before taking effect. 5 U.S.C. § 553. An agency such as FERC which promulgates a new rule "without observance of procedure required by law" has violated the APA. 5 U.S.C. § 706(2)(D). However, in this case, unlike the plaintiff in *NYCERS*, on which Niagara relies in support of its demand for APA review, Niagara *does not* contend that FERC violated the notice and comment provisions of Section 553(b)(A) of the APA.[30] Rather, Niagara alleges that

28. In this context, the D.C. Circuit's agreement that the orders challenged by Niagara in *Niagara v. FERC* announced rules of "general application" is inconsequential since Niagara doesn't challenge the rules themselves, only the failure to apply them to its existing contracts.

29. There, the court rejected EPA's claim that its interpretation of the storage provision of the Resource Conservation and Recovery Act ("RCRA") was an immune exercise of enforcement discretion. 996 F.2d at 333 (citing *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Brock*, 783 F.2d 237, 245–46 (D.C.Cir.1986) ("Nothing in … the holding or policy of *Heckler v. Chaney* precludes review of a proper plaintiff's timely challenge of an agency's announcement of its interpretation of a statute," even when that interpretation is advanced in the context of a decision not to take enforcement action.))

30. In any event, the notice and comment requirement does not apply "to interpretive rules [or to] general statements of policy." *See Zhang v. Slattery*, 55 F.3d 732, 745 (2d Cir.1995) (interim rule promulgated by Attorney General which directly contradicted Board of Immigration Appeals decision denying asylum to Chinese citizens seeking to avoid China's "one couple, one child" policy was never properly promulgated as legislative rule under APA, where rule changed existing policy and was never subject to notice and comment period). The distinction between

legislative and interpretive rules is sometimes difficult to apply:

> In distinguishing between the two types of rules, the central question is essentially whether an agency is exercising its rule-making power to clarify an existing statute or regulation, or to create new law, rights, or duties in what amounts to a legislative act. Since legislative rule-making involves [an] agency's delegated power to make law through rules, it is subject to the public participation and debate that notice and comment procedures provide. Legislative rules have the force of law.… Interpretive rules, on the other hand, do not create rights.… A rule is interpretive … if it attempts to clarify an existing rule but does not change existing law, policy, or practice.

*Id.* (internal quotations and citations omitted). As noted by the D.C. Circuit in *Niagara v. FERC*, FERC neither created nor denied new rights, law or policy with its rule of "general application." Indeed, it is clear that the alleged "continuous challenge rule" is no more than FERC's reiteration of its "general policy 'against invalidating contracts for which a PURPA-based challenge was not timely raised—that is, before the contracts were executed,' so as not 'to upset the settled expectations of parties to, and to invalidate any of their obligations and responsibilities under, such PURPA sales contracts.'" *Connecticut Valley Elec. Co. v. FERC*, 208 F.3d 1037, 1046 (D.C.Cir.2000).

FERC's decision not to provide it with the same relief granted to CL & P was unlawful. To wit, Niagara claims that FERC's refusal "entertain requests as a consequence of this order asking us to invalidate on this basis [pre-emption of state statute which purported to require PURPA PPA rates in excess of avoided costs] other, pre-existing contracts where the avoided cost issue could have been raised," *CL & P,* 70 F.E.R.C., at 61,029, 1995 WL 9931, "create[s] a barrier to Niagara's obtaining effective relief from the PSC under Section 210(f) of PURPA." *Id.* at ¶ 40, 1995 WL 9931.[31] The utility surmises that if FERC had given Niagara the relief it requested in *CL & P II* and *O & R IV,* FERC's decisions or declaratory orders in favor of Niagara would be the equivalent of its published PURPA regulations which PSC, in turn, would be obligated to implement pursuant to Section 210(f) of PURPA.[32] Thus, Niagara contends it would be entitled to obtain relief from PSC's failure to implement these declaratory orders in the context of a PURPA Section 210(h) enforcement action but for FERC's arbitrary and capricious refusal to act.

**31.** Of course Niagara could not actually obtain any relief from PSC pursuant to Section 210(f) of PURPA since, as discussed above, that section of the statute merely requires states to implement FERC's PURPA regulations. Rather, Niagara would first have to ask FERC to commence an enforcement action against PSC pursuant to Section 210(h) and then bring the action itself if FERC refused.

**32.** Niagara's argument presupposes that FERC orders such as those in *CL & P I* and *O & R III* have binding effect, like FERC regulations, on parties other than those involved directly in the underlying administrative proceedings. However, in *Niagara v. FERC,* in spite of the D.C. Circuit's view that the FERC orders challenged by Niagara "announc[ed] a rule of general application" the orders were of "no legal moment" since the court nonetheless declined jurisdiction to review the orders. 117 F.3d at 1488. Indeed, the court deemed the orders ineffectual "unless and until a district adopts [FERC's] interpretation when called upon to enforce the PURPA." *Id.* Such orders, "much like [memoranda] of law," do "nothing more than state how the FERC interprets its own regulations." *Id.*

*Connecticut Valley Elec. Co. v. FERC, infra,* is instructive on this issue. There, the plaintiff electric utility ("Connecticut Valley") sued FERC after the Commission refused to take action on its petition to revoke the QF status of Claremont, a small power producer ("SPP"), from whom it was obligated to purchase energy pursuant to a PPA. *See Connecticut Valley Elec. Co. v. FERC,* 208 F.3d at 1046 (citing *Connecticut Valley Elec. Co. v. Wheelabrator Claremont Co.,* 82 F.E.R.C. ¶ 61,116, at 61,419–20, 1998 WL 64136(1998)). Claremont was selling its "gross" electrical output to Connecticut Valley utility which is "all electricity produced by the facility," as opposed to its "net" output which is gross output less the electricity used by Claremont in its own operations. 208 F.3d at 1040. Claremont purchased the power required for its internal operating needs directly from Connecticut Valley at a tariffed rate. By selling its gross output to Connecticut Valley at full avoided costs, Claremont was "in effect selling back at a significant markup the quantum of electricity it purchased from the utility for its internal operating needs." *Id.*[33] This resulted in Connecticut Valley paying more than its

**33.** Section 3 of the FPA prohibits an SPP from obtaining QF status if it is "engaged in the generation or sale of electric power (other than electric power solely from cogeneration facilities or SPP facilities)." 16 U.S.C. § 796(17)(c)(ii). Since SPPs in Claremont's position were selling electric power which they purchased directly from utilities, they were no longer "not primarily engaged" in the sale of non-alternatively produced electricity.

avoided costs for the difference Claremont's net and gross output.

FERC determined in a 1991 decision that under Section 3(17)(C)(ii) of the FPA, a SPP which sells more than its net output of energy cannot be a QF. *See Turners Falls, Ltd. P'ship,* 55 F.E.R.C. ¶ 61,487, at 62,668, 1991 WL 501859 (1991). Based on this decision, Connecticut Valley petitioned FERC in 1993 to revoke Claremont's status as a QF, take jurisdiction over its PPA with Claremont pursuant to Sections 205 and 206 of the FPA, and either rescind the contract and retroactively determine just and reasonable rates for past sales or at least prospectively reform the contract to ensure it need only purchase Claremont's net output going forward. *Connecticut Valley,* 208 F.3d at 1041. FERC refused to revoke Claremont's QF status or provide alternative relief to Connecticut Valley because "not until *Turners Falls* " was it "clear that gross sales would violate § 3(17)(C)(ii) and thus preclude QF status." *Id.* at 1042 (citing *Connecticut Valley Elec. Co. v. Wheelabrator Claremont Co.,* 82 F.E.R.C., at 61,422, 1998 WL 64136). Because many QFs had in good faith entered into long-term contracts for the sale of their gross output, and "not wanting to

upset their settled expectations," FERC adopted a remedial policy which was only partially retroactive. *Id.* The Commission stated it would revoke the QF status of any facility which sold in excess of its net output pursuant to a contract entered into after the issuance of *Turners Falls. Id.* However, Connecticut Valley's PPA with Claremont was executed in 1987. *See id.* at 1041. Connecticut Valley sued asserting that FERC's refusal to act on its petition violated Section 210 of PURPA and Section 3 of the FPA and was an abuse of FERC's remedial discretion.

The D.C. Circuit disagreed holding that FERC "reasonably infers the parties' settled expectations from the terms of their contract" and "either party may avoid such an inference by including a specific reservation in its contract or by challenging the validity of a contract provision at the time it executes the contract." *Id.* FERC's application of its "general rule inferring the settled expectations of the parties to a contract from the terms of their agreement" was not a legislative action, but merely interpretive, and thus "not arbitrary or capricious" pursuant to the APA. *Id.* at 1047.[34] Thus, FERC's failure to apply its determination in *CL & P I* retro-

---

**34.** In *Connecticut Valley,* the plaintiff utility made the same arguments that Niagara makes here, that is, Section 210 of PURPA expressly requires FERC to "balance the interests of consumers against those of producers" and ensure PPA rates do not exceed a utility's avoided costs. 208 F.3d at 1045. Connecticut Valley argued there, as Niagara does here, that FERC's failure to do so violated PURPA and the APA. The court disagreed, noting that FERC's only obligations under Section 210 of PURPA were to promulgate and periodically revise its regulations. *Id.* at 1043. Thus, FERC's refusal to rescind Claremont's QF status or reform the contracts which allowed Claremont to collect more than Connecticut Valley's avoided costs for the facility's gross output "[could] not be a violation of § 210 [of PURPA]." *Id.* Rather, FERC's decision not to take any action in

response to Claremont's apparent violation of § 3(17)(C)(ii) was merely an "announcement of the position it would take in any future enforcement action that [Connecticut Valley] might bring, ... namely that it will not seek to remedy violations of § 210 arising from [the SPP's] sale of gross output under a contract entered into prior to [FERC's] decision in *Turners Falls." Id.*

This conclusion was based largely on the D.C. Circuit's disagreement with Connecticut Valley that the overriding purpose of PURPA was to ensure reasonable rates for electric consumers and rates not in excess of avoided costs for utilities. Indeed, the Supreme Court has disagreed with this characterization, stating that the focus of Title II or Section 210 of PURPA is "to encourage the development of cogeneration and small power production facilities" by addressing "problems imped[ing]

actively to invalidate Niagara's QF contracts which contained rates in excess of avoided costs "may be characterized simply as refusal to do more than it was required to do by statute, that is, implement and periodically revise regulations to encourage cogeneration." *NYSEG*, 117 F.Supp.2d at 234. "As such, FERC's actions did not exceed its authority or act in contravention of the law when it declined to "enforce" PURPA in the manner requested by [Niagara.]" *Id.*[35]

Niagara attempts to distinguish its plight from NYSEG's by arguing that unlike the latter, it is not objecting to contract rates based on faulty avoided costs estimates which exceeded actual avoided costs over the life of the PPAs. Rather, Niagara insists the contract rates at issue herein "never complied with PURPA" because they were based upon a six-cent rate and imposed "without regard to avoided cost." However, as the D.C. Circuit's decision in *Connecticut Valley* made clear, Niagara's argument merely highlights a distinction without a difference.

The court determined in *Connecticut Valley* that FERC's "grandfathering" of Claremont's PPA with Connecticut Valley in the face of a clear statutory violation was within its discretion. Indeed, as FERC acknowledged in *Turners Falls*, Claremont was not even a QF within the meaning of the FPA which disqualifies any QF selling more than its net output of power. Thus, Connecticut Valley argued as Niagara does here, that its PPAs with Claremont never complied with PURPA and should be voided *ab initio*. However, the court found that FERC did not abuse its remedial discretion pursuant to the APA by deciding not to revoke Claremont's QF status or provide any alternative relief since the relevant statutory purpose of PURPA was to "encourage the development of non-traditional generating facilities." 208 F.3d at 1045. Of particular application here, the court noted "[t]he breadth of agency discretion is, if anything, at [its] zenith when the action assailed relates primarily not to the issue of

the development of non-traditional generating facilities." *FERC v. Mississippi*, 456 U.S. at 750, 102 S.Ct. 2126. "In other words, [Section 210] reflects, predominantly, solicitude for certain types of producers rather than for the consumers who must pay their rates." *Connecticut Valley*, 208 F.3d at *1044*. Thus, when Connecticut Valley argued that Section 210 of PURPA "require[d] FERC to cap QF rates at full avoided cost, it [was] correct only in the limited sense that the Commission is required to promulgate regulations to that effect." *Connecticut Valley*, 208 F.3d at 1043. "[FERC] satisfied that obligation when it promulgated 18 C.F.R. § 292.304(a)(2)" which limits PPA rates to a utility's avoided costs. *Id.*

**35.** Indeed, this Court rejected a nearly identical claim against FERC in *NYSEG*. There, the plaintiff utility argued that since PURPA itself states that "no rule prescribed [by FERC] ... shall provide for a rate which exceeds the incremental cost of the electric utility of alternative electric energy," 16

U.S.C. § 824a–3(b), FERC's attendant regulation, 18 C.F.R. § 292.304(b)(5)—which provides that a purchase rate which "differs from avoided costs" at the time energy is delivered pursuant to a long-term PPA does not violate PURPA—was unlawful. This Court:

disagree[d] with NYSEG's contention that PURPA requires FERC to take an active role in monitoring its regulations and QF contracts pursuant to PURPA to ascertain no utility pays more than avoided costs for purchases. FERC fulfilled its obligations under PURPA when it promulgated rules to "encourage cogeneration ... which rules require electric utilities" to offer to buy electric energy from and sell electric energy to QFs. 16 U.S.C. § 824a–3(a).... Consequently, FERC's refusal to modify or waive its rules retrospectively to ascertain that NYSEG, an electric utility, is not disadvantaged by a PURPA contract is not a refusal to "enforce" PURPA.

*NYSEG*, 117 F.Supp.2d at 234.

ascertaining whether conduct violates the statute, or regulations, but rather to the fashioning of policies, remedies, and sanctions." *Id.* at 1044 (quoting *Niagara v. Federal Power Co.*, 379 F.2d 153, 159 (D.C.Cir.1967); *Louisiana Pub. Serv. Comm'n v. FERC*, 174 F.3d 218, 225 (D.C.Cir.1999)).[36]

▮ Niagara relies on *Harper v. Virginia Dep't of Taxation*, 509 U.S. 86, 113 S.Ct. 2510, 125 L.Ed.2d 74 (1993) and *James B. Beam Distilling Co. v. Georgia*, 501 U.S. 529, 111 S.Ct. 2439, 115 L.Ed.2d 481 (1991) ("*Beam*"), for the proposition that "if an interpretation of federal law is applied to the parties in the case in which the interpretation is announced, it must be applied to all other cases then pending." However, these cases relate to applying changes in the law based on evolving interpretations of the Supreme Court. *Harper*, 509 U.S. at 97, 113 S.Ct. 2510 ("When this Court applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must

be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate our announcement of the rule.") (citing *Beam*, 501 U.S. at 540, 111 S.Ct. 2439). In contrast, retroactive rulemaking by an agency such as FERC is prohibited unless Congress expressly conveys this power. *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988); *see also Landgraf v. USI Film Prods.*, 511 U.S. 244, 269–70, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994) (although statute does not operate retrospectively simply because it "upsets expectations based in prior law," every statute which takes away or impairs vested rights acquired under existing law is impermissibly retrospective).[37] Consequently, this Court is not persuaded by Niagara's argument that "where legal error occurs, there is at least a 'presumption of retroactive relief.'"

To the extent that Niagara contends that FERC abused its discretion in failing

**36.** "In other words, the Commission ordinarily has remedial discretion, even in the face of an undoubted statutory violation, unless the statute itself mandates a particular remedy." *Id.* (citing *Towns of Concord, Norwood & Wellesley v. FERC*, 955 F.2d 67, 72–73 n. 8 (D.C.Cir.1992) (FERC's refusal to refund rates charged by utility in excess of filed rates within agency's remedial discretion despite towns' argument that their right to be charged no more than filed rates pursuant to FPA "ceased to exist" unless "backed up by a remedy" and FERC's refusal to order refunds was tantamount to authorizing utility to violate FPA's "filed rate doctrine")).

**37.** In *NYSEG*, this Court rejected the plaintiff utility's argument that retroactive rulemaking was authorized there based on the "patent illegality" of: 1) 18 C.F.R. § 292.304(b)(5) which allowed the defendants QFs to collect a rate in excess of avoided costs because it was based on estimated LRACs in a long-term PPA; and 2) the PPA rates themselves because the QFs had no "vested interest" in

rates which violate PURPA. To wit, this Court held "FERC's regulations, which account for and forgive a rate in excess of avoided costs in NYSEG's very circumstances, are not illegal and QFs are entitled to rely on purchase rates in long-term PPAs even if they violate PURPA's rate cap." 117 F.Supp.2d at 237 (citing *Connecticut Valley*, 208 F.3d at 1043–44; *Indep. Energy Producers Assoc., Inc. v. California Pub. Utils. Comm'n*, 36 F.3d 848, 858–59 (9th Cir.1994) ("*IEP*") (federal regulations provide that QFs are entitled to "lock in" energy sales at an avoided cost rate calculated at the time the contract is signed even if the utilities' avoided costs are lower than estimated at the time the energy is delivered); *Smith Cogeneration Mgmt., Inc. v. Corp. Comm'n*, 863 P.2d 1227, 1240 (Okla. 1993) (cogenerator which chooses to set purchase rate based on avoided costs in long-term PPA as estimated at time contract is signed is entitled to receive benefits of contract even if, due to changed circumstances, contract price for power at time of delivery is unfavorable to utility)).

to take into account "equitable considerations favoring relief for Niagara and its ratepayers," the court in *Connecticut Valley* rejected similar arguments that PURPA required FERC to consider the harm to consumers in declining to take action against Claremont. The court found that PURPA's requirement that "rates for purchases ... shall be just and reasonable to the electric consumers of the electric utility and in the public interest ..." was directed only to FERC's exercise of *rulemaking* authority over the rates utilities must pay QFs for power. 208 F.3d at 1045 (quoting 16 U.S.C. § 824a–3(b)). Since the Supreme Court in *API* already determined that the full avoided cost rule satisfies the requirements of 16 U.S.C. § 824a–3(b), "[t]he Commission did not abuse its discretion when it omitted explicitly to consider anew the interests of consumers" and utilities. *Id.*

Based on the foregoing, the Court finds Niagara's claim that FERC's refusal to invalidate existing QF contracts pursuant to PURPA violates the APA fails to state a cause of action upon which relief can be granted and must be dismissed pursuant to Fed.R.Civ.P. 12(b)(6).

b. *Subject Matter Jurisdiction*

 Assuming any of Niagara's claims against FERC are not fatally flawed by failure to state a claim, FERC argues, in the alternative, that this court lacks subject matter jurisdiction over Niagara's claims. FERC contends: (1) there is no justiciable controversy because the declaratory orders at issue have no present effect on Niagara; and (2) the claims herein are not ripe for adjudication.[38] FERC argues that the issues which Niagara presents are not purely legal since it makes several factual claims in its complaint including allegations concerning "the massive continuing financial burden imposed on Niagara and its ratepayers; the non-voluntary nature of the contracts; the QFs' deliberate reliance on law and regulations which they knew were subject to change; ... and the fact that New York's Six–Cent Law has been under continuous challenge since at least 1987." Amended Complaint ¶ 27. Niagara also alleges it was "at least as diligent as [CL & P] in challenging the state requirement to purchase QF power at a rate above avoided cost," and that as to some of the contracts at issue in this case "application of federal law [PURPA] would reduce the rates charged without any amendment of the pricing provisions of the contracts." *Id.* at ¶¶ 29–30. FERC argues that resolution of these factual matters must occur, if at all, in the context of PSC administrative proceedings or an enforcement action under Section 210(h) of PURPA. Niagara does not respond to this argument.

**38.** In the context of administrative law, the "ripeness" doctrine "prevent[s] the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies," and also "protect[s] the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148–49, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). In applying the doctrine, courts must consider: (1) whether the issues presented are purely legal; (2) whether the challenged agency action constitutes 'final agency action' within the meaning of the Administrative Procedure Act; (3) whether the challenged agency action has or will have a direct and immediate impact on the petitioner; and (4) whether the resolution of the issues will foster, rather than impede, effective enforcement and administration by that agency. *Occidental Chem. Corp. v. FERC*, 869 F.2d at 129 (quoting *Pennzoil Co. v. FERC*, 742 F.2d 242, 244 (5th Cir.1984)).

FERC also asserts that the declaratory orders under challenge by Niagara are not final agency action since no legal rights or obligations flow from them. Again, Niagara does not dispute this argument, nor could it in light of the D.C. Circuit's opinion in *Niagara v. FERC* concerning the binding effect of the *CL & P I* and *O & R III* orders. *See* 117 F.3d at 1488. In a related argument, FERC contends that the subject orders neither had nor have any immediate impact on Niagara because the utility retains whatever rights it had to enforce PURPA against PSC. Niagara responds that because FERC attempted to "define the legal framework within which the state regulatory commissions must administer PURPA in a manner that adversely affects Niagara's right to obtain relief from six-cent payments," FERC's decisions in *CL & P II* and *O & R IV*, do have a present effect on its legal rights. However, as discussed above, Niagara is not actually challenging FERC's definition of the legal framework in which PSC must administer PURPA and attendant New York law. Instead, Niagara merely challenges FERC's refusal to apply it retroactively to invalidate existing contracts, a decision reserved to FERC's enforcement discretion. *See Heckler v. Chaney*, 470 U.S. at 831, 105 S.Ct. 1649. Finally, FERC avers that judicial intervention would interfere with the orderly course of the enforcement mechanism provided by PURPA. As already discussed, the notion that FERC's orders are not "final agency action" and that pre-enforcement review of them would "disrupt the elaborate enforcement scheme that the Congress created" in PURPA was affirmed by the D.C. Circuit in *Niagara v. FERC. See* 117 F.3d at 1489.

Consequently, the Court holds that a second, independent basis for dismissing Niagara's claims against FERC is the absence of subject matter jurisdiction.

C. *Motions to Dismiss the Claims against PSC*

PSC, along with IPPNY, seek dismissal of Niagara's claims against PSC on seven grounds: 1) The court has no subject matter jurisdiction over Niagara's claims against PSC; 2) Niagara's present claims against PSC are an impermissible collateral attack on agency action; 3) the Court is obligated to dismiss the complaint as a matter of equitable discretion; 4) the statute of limitations has run on Niagara's claims against PSC; 5) Niagara's claims are precluded based on the doctrines of *res judicata* and collateral estoppel; 6) the complaint is barred by the Eleventh Amendment;[39] and finally, 7) the Third Circuit's decision in *Freehold Cogeneration Assoc. v. Bd. of Regulatory Comm'rs. of the State of New Jersey*, 44 F.3d 1178 (3d Cir.1995), *cert. denied,* 316 U.S. 815, 116

---

**39.** PSC did not, in its original moving papers, assert it was entitled to relief based on immunity afforded the states pursuant to the Eleventh Amendment. Rather, the immunity claim appeared for the first time in a letter brief submitted by PSC in response to the Court's invitation in June 1999, to all counsel to submit briefs outlining "new developments in the applicable law which they believe are outcome determinative." PSC asserts that the Supreme Court's decisions in *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996); *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 117 S.Ct. 2028, 138 L.Ed.2d 438 (1997); and *College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999) are new developments in the law which preclude the claims of Niagara against it and its individual commissioners. Niagara and NYSEG object to PSC's reliance on these cases equating their citation to "a new motion to dismiss." Because the Court holds, as discussed further below, that the Eleventh Amendment does not bar Niagara's claims against PSC in any event, it need not address these objections.

S.Ct. 68, 133 L.Ed.2d 29 (1995)[40] bars the relief Niagara seeks against PSC.

### 1. Subject Matter Jurisdiction

■ As discussed previously, PURPA grants federal district courts jurisdiction to act on a utility's petition to force a state regulatory authority to implement a PURPA rule or regulation.[41] This is true, however, only if the utility has previously petitioned FERC to commence an enforcement proceeding against a state commission and FERC has refused or failed to do so within 60 days of the petition. It is

---

**40.** There, the court held that state agencies such as PSC are pre-empted from altering PURPA contracts once ordered and approved. 44 F.3d at 1192.

**41.** Section 210(h)(2)(B) provides that

Any electric utility ... may petition the Commission to enforce the requirements of subsection (f) of this section as provided in subparagraph (A) of this paragraph. If the Commission does not initiate an enforcement action under subparagraph (A) against a State regulatory authority ... within 60 days following the date on which a petition is filed under this subparagraph ... the petitioner may bring an action in the appropriate United States district court to require such state regulatory authority ... to comply with such requirements, and such court may issue such injunctive or other relief as may be appropriate....

16 U.S.C. § 824a–3(h)(2)(B). Section 210(f), which is referenced in Section 210(h)(2), requires the state regulatory authority to make rules implementing the FERC's rules for regulated utilities in that state. See 16 U.S.C. § 824a–3(f).

**42.** Niagara's response to defendants' citation of its failure to petition FERC in the first instance for the relief it seeks herein against PSC is two-fold. First, Niagara vaguely suggests that the fact that it intervened in the FERC proceeding commenced by O & R satisfied its administrative exhaustion requirement. However, the Court doubts that Niagara can exhaust administrative remedies by proxy. See e.g., Platte River Whooping Crane Critical Habitat Maint. Trust v. FERC, 876

---

undisputed that Niagara did not follow this procedure prior to commencement of the present action.[42] For its part, Niagara does not even cite the jurisdictional basis of Section 210(h) of PURPA in its amended complaint. Instead, it argued in response to FERC's claims regarding the absence of subject matter jurisdiction that Section 210(h) of PURPA would not afford it complete relief since it could not sue FERC in an enforcement action against PSC. Assuming, however, Niagara intended to rely on this section in alleging that PSC violated the incremental cost limita-

---

F.2d 109, 113 (D.C.Cir.1989) (jurisdictionally insignificant that one party raises issue in petition for rehearing if party bringing request for judicial review did not). Moreover, FERC noted in both O & R IV, see 71 F.E.R.C., at 61,147 n. 20, 1995 WL 216782, and CL & P II, see 71 F.E.R.C., at 61,154 n. 43, 1995 WL 216783, that it had no specific knowledge of Niagara's QF contract claims based on its status as a mere intervenor with an interest in the outcome of the administrative proceeding. Unlike O & R and CL & P, Niagara did not file its own petition for relief before FERC, a fact which the agency clearly referenced in declining to apply its determination on the merits in CL & P I to "other parties not before us in this proceeding and to other contracts not before us." CL & P II, 71 F.E.R.C., at 61,154, 1995 WL 216783. Thus, it is not at all clear that Niagara's status as an intervenor in O & R's case was legally significant.

Niagara also contends that it was not required to exhaust administrative remedies after FERC dismissed O & R's petition, making clear that "any further request that it enforce the avoided-cost limit against the continuing requirement to make payments under the Six–Cent Law would be futile." See Ahrens v. Bowen, 852 F.2d 49, 54 (2d Cir.1988) ("Because of the secretary's clear position that he lacked power to so modify the agreement, any further administrative proceedings would have been futile; therefore exhaustion was not required."). The Court rejects this argument since FERC never stated or implied it had no *power* to grant O & R relief. In contrast, FERC assumed power under PURPA to grant CL & P's administrative petition and

tion of PURPA and its regulations, defendants are correct. This Court has no subject matter jurisdiction over any claim against PSC based on PURPA in the absence of proof that Niagara complied with the jurisdictional pre-requisites of the statute.

▮ However, Niagara's remaining claim against PSC for violation of the Supremacy Clause [43] of the United States Constitution triggers federal question jurisdiction pursuant to 28 U.S.C. § 1331. *See NYSEG*, 117 F.Supp.2d at 243 (citing *Freehold*, 44 F.3d at 1184–85).

2. *Collateral Challenge to Agency Action*

▮ Defendants argue that Niagara's claim against PSC, which indirectly challenges the validity of its prior orders is impermissible because the New York legislature established a manner for directly challenging agency action via Article 78 proceedings. *See PSC v. Rochester Tel. Corp.*, 55 N.Y.2d 320, 325, 449 N.Y.S.2d 463, 434 N.E.2d 699 (1982) (when legislature establishes procedure for directly challenging agency action, party cannot circumvent said avenue with subsequent collateral attacks). In response, Niagara relies on *Watergate II Apartments v. Buffalo Sewer Auth.*, 46 N.Y.2d 52, 57, 412 N.Y.S.2d 821, 385 N.E.2d 560 (1978) and its progeny holding that a party need not exhaust administrative remedies prior to challenging unconstitutional or *ultra vires*

action by an administrative agency. Indeed, it is well-settled that when an agency acts outside its jurisdiction or in a manner not authorized by statute, the rule against collateral attacks does not apply. *See NYSEG*, 117 F.Supp.2d at 248 (citing *Consol. Edison I*, 98 A.D.2d at 381, 471 N.Y.S.2d 684); *see also PSC v. Rochester Tel. Corp.*, 55 N.Y.2d at 325, 449 N.Y.S.2d 463, 434 N.E.2d 699. Thus the Court finds that the rule against collateral attacks does not bar Niagara's pre-emption or Supremacy Clause claim.

3. *Equitable Discretion*

▮ Defendants argue that this Court should dismiss Niagara's claims against PSC based on the doctrine of equitable discretion. *See Alabama Public Serv. Comm'n v. Southern Ry. Co.*, 341 U.S. 341, 349, 71 S.Ct. 762, 95 L.Ed. 1002 (1951) (Supreme Court held that when adequate state court review of state agency action involving "predominantly local factors" is available, intervention of a federal court is not necessary). The identical argument was made by PSC and rejected by this Court in *NYSEG*. *See* 117 F.Supp.2d at 248 ("[T]he Court is not persuaded that this case is so concerned with the domestic policies of New York as to render the doctrine of equitable discretion applicable. Indeed, review of PURPA and its regulations reveals that quite the opposite is true.") [44] As such, the doctrine of equita-

---

simply declined to exercise this power in the case of O & R.

**43.** According to the Supremacy Clause, the U.S. Constitution and the laws passed pursuant to it are the "supreme laws of the land, binding alike upon the states, courts and the people, anything in the Constitution or Laws of any state to the contrary notwithstanding." *Testa v. Katt*, 330 U.S. 386, 390, 67 S.Ct. 810, 91 L.Ed. 967 (1947). Although not alleged directly in the amended complaint, the Court assumes Niagara's Supremacy Clause claim is

based on PSC's continued implementation of the Six–Cent Law as grandfathered by amendments to the N.Y. Pub. Serv. Law in spite of the avoided cost limitation set forth in PURPA.

**44.** In *NYSEG*, this Court noted:

PURPA and its implementing regulations establish "an extensive federal system to encourage and regulate the sale of electrical energy by QFs." *Freehold*, 44 F.3d at 1191. However, as referenced above,

ble discretion does not obligate this Court to refrain from deciding the present dispute.

### 4. Statute of Limitations

■ PSC, along with Saranac and Lockport, argue that Niagara's complaint is barred on the ground of statute of limitations because under New York Civil Procedure Law, Article 78 proceedings to challenge agency action must be commenced within four months of final agency action. *See* N.Y.C.P.L.R. § 217. However, in addition to challenging PSC's implementation of N.Y.Pub.Serv.Law § 66–c via requirement and approval of QF contracts with rates in excess of avoided costs, Niagara alleges that the state statute itself is unconstitutional. Niagara's Supremacy Clause argument "widens the Court's analysis of PSC's action from mere implementation of PURPA to a question of federal pre-emption" and is therefore not governed by the four-month limitation period. *NYSEG,* 117 F.Supp.2d at 251. The Court agrees that since Niagara's claim against PSC challenges the constitutionality of § 66–c, it is governed by a six-year statute of limitations, *See N.Y.Pub.Int. Research Group v. Levitt ("NYPIRG"),* 62 A.D.2d 1074, 1075, 404 N.Y.S.2d 55 (3d Dep't 1978), *app. dismissed,* 46 N.Y.2d 849, 414

N.Y.S.2d 314, 386 N.E.2d 1335 (1979) (agreeing that challenge to unconstitutional governmental conduct governed by six-year statute of limitations as provided by N.Y.C.P.L.R. § 213(1)).

■ Niagara argues, however, that the six-year limitations period did not begin to run until § 66–c was amended in 1992. To wit, the utility contends that the amendment not only extended its six-cent obligation with respect to QF contracts executed and filed prior to June 26, 1992, it also imposed the minimum six-cent payment on long-term PPAs with QFs for all power to be purchased via the contract in addition to 10% over the amount of electricity provided for therein. *See* N.Y.Pub. Serv.Law § 66–c(2)(b); (c). Niagara also argues that the 1992 amendment imposed the six-cent obligation on contracts which simply referenced a "tariff" or "statutory minimum" rate in effect at time of payment. Thus, Niagara alleges that the harm it complains of herein accrued subsequent to passage of the amendment and within the applicable six-year limitations period.

The problem with this argument is that the amendment to § 66–c is not a "new enactment" according to New York statutory construction. Section 66–c as amended

---

PURPA is not a self-sufficient body of federal law. PURPA amended the FPA and its Section 210(f) grants state regulatory authorities "power to *implement* the requirements of Section 210(a) and the relevant regulations." *Freehold,* 44 F.3d at 1191–92. A state regulatory authority complies with PURPA "by issuing regulations, resolving disputes on a case-by-case basis, or by taking any other action reasonably designed to give effect to FERC's rules." *FERC v. Mississippi,* 456 U.S. at 751, 102 S.Ct. 2126. "The most that can be said is that ... [PURPA] establishes a program of cooperative federalism that allows the States, within limits established by federal minimum standards, to enact and administer

their own regulatory programs, structured to meet their own particular needs." *Id.* at 767, 102 S.Ct. 2126.

By providing that states would implement PURPA by enactment of regulatory programs within prescribed guidelines, Congress "expressed its intention that state law provides the content of and operates as federal law." *Corcoran v. New York Power Auth.,* 202 F.3d 530, 538 (2d Cir.1999) (concluding that Congress intended substantive rules for decisions under federal Price–Anderson Act would derive from laws of states where nuclear accidents occurred, unless such laws were inconsistent with Price–Anderson).

117 F.Supp.2d at 248–49.

simply carried forward the previous provisions as originally enacted for contracts entered prior to June 1992 and repealed its application to subsequent agreements. "The provisions of a law repealing a prior law, which are substantial re-enactments of provisions of the prior law, shall be construed as a continuation of such provisions of prior law, modified or amended according to the language employed, and not as new enactments." *See* N.Y.Gen. Constr.Law § 95. Because the amendment did not change any of Niagara's obligations with respect to pre-June 1992 QF contracts, but simply continued to impose the very same requirements as the original enactment, the statute of limitations began to run in 1981 when the Six-Cent Law became effective.[45]

In the alternative to arguing in support of a six-year limitations period, Niagara contends that it is being subjected to a "continuing wrong" and therefore its statute of limitations has not yet begun to run. *See Davis v. Rosenblatt,* 159 A.D.2d 163, 168, 559 N.Y.S.2d 401 (3d Dep't 1990) (continuing payment of disparate judicial salaries triggers equal protection considerations and thus tolls statute of limitations); *Grossman v. Rankin,* 43 N.Y.2d 493, 506, 402 N.Y.S.2d 373, 373 N.E.2d 267 (1977) (failure to follow constitutional mandate in classifying civil service positions is continuing wrong such that usual time limits did not bar review); *Taub v. Comm. on Prof'l Standards,* 200 A.D.2d 74, 77–78, 612 N.Y.S.2d 272 (3d Dep't 1994) (threat of disciplinary action for attorney's continued exercise of constitutional right to commercial expression constitutes continuing harm not governed by four-month statute of limitations). According to Niagara, every time a tariff is refiled and approved by PSC, the validity of the 1992 amendment to § 66-c is raised anew.[46]

This Court acknowledged the possibility of such an argument in *NYSEG* but did not address it since the plaintiff utility therein never raised it.[47] Niagara's contention that the "continuing wrong" exception should apply to its claims against PSC

---

**45.** Niagara avers that the 1992 amendment imposed new obligations by way of requiring the six-cent rate for purchases pursuant to all contracts referencing a "utility tariff" or "statutory minimum sales price." N.Y.Pub. Serv.Law § 66-c(2)(a)(ii). Although Niagara argues these PPAs were not previously subject to the six-cent rate, its claim is belied by the fact that the "statutory minimum sales price" would obviously have referred to the six-cent rate prior to 1992. To the extent that a filed utility tariff rate reflecting avoided costs would have been less than six cents, PSC's unappealed 1993 decision in *On-Site Generation Proceeding—Niagara Mohawk Power Corp.'s Proposed Buyback Tariff,* established that QFs were entitled to the higher of the two rates. *See* p. 114, *supra.* Thus, the Court rejects Niagara's contention that the 1992 amendment imposed higher rates or altered its legal obligations with respect to any of these contracts.

**46.** "Federal courts do recognize a continuing wrong theory . . . . The doctrine applies when the defendant's conduct causes plaintiff to sustain damages after the time when the statute of limitations would have expired if it commenced at the time of defendant's first act. Instead, the claim accrues each time the plaintiff sustains damages. The rule is based primarily upon the impracticality and unfairness of requiring a plaintiff to institute his action before he can predict his damages." *See Kahn v. Kohlberg Kravis Roberts & Co.,* 970 F.2d 1030, 1039 (2d Cir.1992), *cert. denied* 506 U.S. 986, 113 S.Ct. 494, 121 L.Ed.2d 432 (1992) (citing *Taylor v. Meirick,* 712 F.2d 1112, 1119 (7th Cir.1983)).

**47.** *See NYSEG,* 117 F.Supp.2d at 247 ("[D]etermination of when the applicable limitations period began to run, if ever, is troublesome based on the alleged continuing nature of the statutory and/or constitutional violation. The Court finds it unnecessary to pass on the merits of this issue . . . since NYSEG's Supremacy Clause claim is subject to dismissal on separate grounds. . . .")

is premised on: (1) PSC's continuing obligation to implement PURPA; (2) PSC's requirement that Niagara continue to file tariffs incorporating the six-cent rate based on the 1992 amendment to N.Y.Pub. Serv.Law § 66–c; and (3) the prospect of sanctions Niagara may face if it breaches its contracts by failing to pay the six-cent rate.

PSC relies on *PSC v. Rochester Tel. Corp.*, 55 N.Y.2d at 325–26, 449 N.Y.S.2d 463, 434 N.E.2d 699 (any claim that PSC's order restricting future investments by telephone companies was over broad and beyond its authority should have been the subject to review via an Article 78 proceeding); *Allied Chem.*, 72 N.Y.2d at 276, 532 N.Y.S.2d 230, 528 N.E.2d 153 (plaintiff was required to challenge PSC's determination that new tariff was not "applicable rate" under QF contract within four-month limitations period of N.Y.C.P.L.R. § 217); and *Gross v. State PSC*, 195 A.D.2d 866, 867, 600 N.Y.S.2d 795 (3d Dep't 1993), *lv. to appeal denied*, 82 N.Y.2d 660, 605 N.Y.S.2d 6, 625 N.E.2d 591 (1993) (limitations period for proceeding seeking judicial review of administrative determination pursuant to N.Y.C.P.L.R. Article 78 commences to run when determination becomes final and binding and has impact upon petitioner, who is thereby aggrieved) in arguing that even if any of its actions about which Niagara complains constitutes a "continuing harm," it must be challenged within four months. The Court is unpersuaded by this argument, however, since none of the cited cases involve an alleged continuing *constitutional* harm.

PSC's alternative argument regarding the inapplicability of the "continuing harm" doctrine to this case is more compelling. Defendants contend that since Niagara alleges that the QF contracts themselves created unconstitutional obligations to pay more than avoided costs for QF power, the Supremacy Clause or preemption claim against PSC arose when the contracts were executed. *See NYPIRG*, 62 A.D.2d at 1075, 404 N.Y.S.2d 55 (statute of limitations on claim that state construction contract violated New York constitution ran from the date of agreement notwithstanding annual payments under contract which continued past date of execution). Defendants also cite *Kahn*, 970 F.2d at 1040, wherein the Second Circuit held that the statute of limitations began to run when a contract requiring one party to commit allegedly illegal acts was executed. The court there rejected the argument now advanced by Niagara that the "continuing wrong theory restart[s] the statute every time an additional illegal act [is] challenged." *See Kahn*, 970 F.2d at 1040. However, as Niagara points out, *Kahn* involved a contract between private parties without government intervention. Indeed, Niagara contends it was only the absence of governmental involvement in the contract at issue in *Kahn* which distinguished the case from *Eli Lilly & Co. v. EPA*, 615 F.Supp. 811 (S.D.Ind.1985) where allegations of continuing misappropriation by the EPA of pesticide registrant's data in registering third party pesticides constituted a continuing wrong and tolled the statute of limitations.

This Court discerns a distinction between the EPA's actions in *Eli Lilly* and PSC's actions or inactions here. To wit, the EPA was alleged to have continually misappropriated the plaintiff chemical company's proprietary research data whereas here, the actions of PSC which occurred after it ordered and approved the allegedly illegal QF contracts were largely ministerial. Thus the Court questions whether these actions or inactions of PSC in failing and/or refusing to relieve Niagara from the burdens of allegedly illegal contracts justify extending the statute of limitations on a "continuing wrong" theory.

The Court need not reach the merits of this issue, however, as Niagara's claims are subject to dismissal in any event as discussed below.

### 5. *Res Judicata and Collateral Estoppel*

 PSC argued in *NYSEG* as it does here that since the plaintiff utility did not appeal the orders which set its LRACs and approved the QF contracts at issue herein, those orders are entitled to preclusive effect and bar Niagara's claims against PSC. Claim preclusion or *res judicata* dictates that "a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Allen v. McCurry,* 449 U.S. 90, 94, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980). This holds true even when "several legal theories depend on different shadings of the facts, or would emphasize different elements of the facts or would call for different measures of liability or different kinds of relief." *Smith v. Russell Sage College,* 54 N.Y.2d 185, 192–93, 445 N.Y.S.2d 68, 429 N.E.2d 746 (1981) (even if there are variations in facts alleged or relief sought, separately stated causes of action may nevertheless be grounded on same "gravamen of the wrong upon which the action is brought"). Under collateral estoppel, once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case. *See Allen,* 449 U.S. at 94, 101 S.Ct. 411.[48]

Defendants argue that PSC's right to require Niagara and other New York utilities to pay six cents per kwH for QF power was established explicitly by the New York Court of Appeals in *Consol. Edison II* and implicitly each time PSC issued an order approving a six-cent contract which Niagara failed to challenge or appeal. Instead, Niagara requested and was granted a "pass through" right with respect to each contract which ensured that any added costs of QF PPAs would be borne by its ratepayers. According to PSC, these unappealed administrative orders are quasi-judicial and entitled to preclusive effect. *See Allied Chem.,* 72 N.Y.2d at 277, 532 N.Y.S.2d 230, 528 N.E.2d 153. Defendants also argue that the Supreme Court's dismissal of ConEd's appeal in *Consol. Edison III,* for lack of a substantial federal question prevents this court from reaching a different conclusion than that reached by the New York Court of Appeals regarding the constitutionality of the Six–Cent Law. *See* 470 U.S. 1075, 105 S.Ct. 1831. Further, defendants contend that Niagara could have, but did not, litigate the pre-emption issue raised here in *Niagara v. PSC,*[49] and is thus barred by the doctrine of *res judicata* from raising the pre-emption issue in this action. The Court addresses these arguments *seriatim.*

 IPPNY's present argument regarding the preclusive effect of the Supreme Court's dismissal of ConEd's appeal in *Consol. Edison III* is precisely the same argument raised before FERC by the interested QFs in *CL & P II.* There, the

---

48. Under the full faith and credit doctrine, federal courts must accord final judgments of state courts the same preclusive effect such judgments would have in the state courts. *See* 28 U.S.C. § 1738. In New York, issue preclusion may arise from the quasi-judicial determinations of administrative agencies. *See Allied Chem.,* 72 N.Y.2d at 276, 532

N.Y.S.2d 230, 528 N.E.2d 153 (PSC adjudicatory determination that new tariff was not "applicable rate" for "old capacity cogenerator" under PURPA contract was dispositive of cogenerator's subsequent state court action to obtain full avoided cost for utility purchases).

49. *See supra* note 11.

QFs contended that the Court of Appeals' determination that the Six–Cent Law was not pre-empted by PURPA precluded FERC from reaching a different conclusion. It is well-settled that "[s]ummary affirmances and dismissal for want of a substantial federal question without doubt reject the specific challenges presented in the statement of jurisdiction and do leave undisturbed the judgment appealed from. They do prevent lower courts from coming to opposite conclusions on the precise issues presented and necessarily decided by those actions." *Mandel v. Bradley,* 432 U.S. 173, 176, 97 S.Ct. 2238, 53 L.Ed.2d 199 (1977). However, summary actions do not endorse the reasoning of the lower court; they must be read only as rejecting the specific challenge presented by the appellant. *Id.* "Summary actions should not be understood as breaking new ground but as applying principles established by prior decisions to the particular facts involved." *Id.* "The precedential significance of [a] summary action ... is to be assessed in the light of all of the facts [presented in the earlier case]." *Id.* at 177, 97 S.Ct. 2238. In *Mandel,* the Supreme Court noted "it is immediately apparent that [the facts relied on in the earlier proceeding] are very different from the facts of this case." *Id.*

FERC held likewise in refusing to deem itself bound by the Court of Appeals' interpretation of PURPA in *Consol. Edison II. See CL & P II,* 71 F.E.R.C., at 61,152, 1995 WL 216783 (citations omitted). Rather, FERC determined that the Supreme Court's dismissal on jurisdictional grounds "went ... only to what was necessary for the Supreme Court to decide the case," and in any event, the decision in *Consol. Edison II* relied on misleading language in the preamble to FERC's PURPA rules, which FERC expressly overturned in *CL & P II. Id.* (citations omitted). Niagara argues in addition to FERC's position on the PURPA pre-emption issue, other facts have changed since the Supreme Court's summary dismissal in *Consol. Edison III,*[50] and in any event, its claim here raises a different legal question than that considered by the Supreme Court.[51]

With respect to the alleged "change" affected by the 1992 amendment to § 66–c, the Court is not persuaded that it actually changed anything in connection with Niagara's QF contract obligations.[52] Moreover, the Court is not persuaded that FERC's clarification of its 1980 preamble language or the other "changed circumstances" re-

---

**50.** To wit, Niagara contends that subsequent to *Consol. Edison III,* (1) Congress and FERC adopted a policy favoring competition amongst all bulk power suppliers; (2) the 1992 amendment to § 66–c of the N.Y.Pub. Serv.Law increased disparity in avoided costs versus QF contract rates because it extended the six-cent rate to include QF capacity up to 10% over contract terms; and (3) PSC's adopted procedures to allow QFs to "lock in" long term PPA rates based on estimated LRACs, thus removing the concern outlined by the Court of Appeals that rate fluctuation would be detrimental to QF development.

**51.** In connection with this latter argument, Niagara alleges that the Court of Appeals considered two issues in *Consol. Edison II:* (1)

whether the state had independent authority to establish QF rates and (2) if so, whether PURPA pre-empted the exercise of that authority. Niagara argues that because ConEd raised only the pre-emption issue in its appeal and this was presumably, the only issue considered by the Supreme Court, it is still free to argue that states lack independent authority to set rates in excess of the avoided cost. This argument is specious however, because if states are *pre-empted* from establishing QF contract rates above avoided costs, they clearly have no independent authority to do so. Thus, resolution of one issue was necessarily determinative of the other.

**52.** *See supra* note 44.

lied on by Niagara constitute changes in relevant *facts* within the meaning of *Mandel* as much as changed policy considerations. Nevertheless, the Court declines to second-guess FERC's determination that it was free to change its mind about states' rights to impose QF PPA rates in excess of avoided costs. Thus, Niagara is not precluded from challenging the legality of the Six–Cent Law based on dismissal of ConEd's appeal by the Supreme Court in *Consol. Edison III.*

With respect to the second issue raised by PSC—the preclusive effect of the unappealed PSC orders approving contracts—this Court assumed without deciding in *NYSEG* that these types of administrative orders which merely set or approved rates in QF contracts are legislative, rather than adjudicative in nature and would thus not bar further litigation. *See NYSEG,* 117 F.Supp.2d at 244–46 ("[P]rospective rate-making, although it often employs quasi-judicial methods of adjudication, does not have preclusive effect because 'the reasonableness of a rate depends upon economic conditions, and numerous policy considerations, all of which invariably change over time, requiring that a utility's rate be susceptible to reconsideration.' ") (quoting *Allied Chem.,* 72 N.Y.2d at 278, 532 N.Y.S.2d 230, 528 N.E.2d 153). The Court thus finds that Niagara's failure to appeal or otherwise challenge PSC's orders which set rates for QF purchases does not preclude the present litigation challenging the legality of PSC's implementation of PURPA and N.Y.Pub.Serv.Law § 66–c. This reasoning compels the same determination with respect to the preclusive effect of the Court of Appeals' decision in *Consol. Edison II* where the court merely examined the legislative history of PURPA and held that PSC could prospectively require utilities to purchase power from QFs at a minimum rate of six cents per kwH.

■ However, PSC's third argument—that Niagara's failure to litigate the issue of pre-emption in *Niagara v. PSC,* 137 Misc.2d at 235, 520 N.Y.S.2d 122, precludes it from raising the issue herein—is more persuasive. In the prior action between Niagara and PSC, Niagara does not dispute that it could have therein raised the claim that PURPA pre-empted PSC from setting rates above avoided costs, but chose not to. It is well-settled that a prior judgment on the merits rendered by a court of competent jurisdiction precludes the relitigation of a claim if there is a "substantial identity of the parties" and if the "same cause of action" is presented in both suits. *Richards v. Jefferson County, Alabama,* 517 U.S. 793, 796, 116 S.Ct. 1761, 135 L.Ed.2d 76 (1996). Moreover, "the prior judgment is generally *'res judicata* not only as to all matters litigated and decided by it, but as to all relevant issues which *could have been but were not raised* and litigated in the suit.' " *Id.* (quoting *Heiser v. Woodruff,* 327 U.S. 726, 735, 66 S.Ct. 853, 90 L.Ed. 970 (1946) (emphasis added)). Citing *Comm'r of Internal Revenue v. Sunnen,* 333 U.S. 591, 599–600, 68 S.Ct. 715, 92 L.Ed. 898 (1948) and *Staten Island Rapid Trans. Operating Auth. v. Interstate Commerce Comm'n ("SIR-TOA"),* 718 F.2d 533, 543 (2d Cir.1983), Niagara argues that FERC's subsequent order in *CL & P I* is a change in law sufficient to render the doctrine of claim preclusion inapplicable.

■ In the first instance, because FERC's decision in *CL & P I* expressly eschewed retroactive effect for utilities such as Niagara which had not been continuously challenging rates it alleged to be illegal, the Court doubts it would even constitute a "change [in] the legal atmosphere" within the meaning of the cited authority. *Sunnen,* 333 U.S. at 600, 68 S.Ct. 715. However, even if the Court

accepted Niagara's claim that FERC's intervening administrative determinations may be applied to alter the result of a matter previously litigated, the "change in controlling law exception" applies only to collateral estoppel, not *res judicata*. *See Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 398, 101 S.Ct. 2424, 69 L.Ed.2d 103 (1981) ("A final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action.... Nor are the *res judicata* consequences of a final, unappealed judgment on the merits altered by the fact that the judgment may have been wrong or rested on a legal principle subsequently overruled in another case."). Based thereupon, Niagara's pre-emption/Supremacy Clause claim against PSC is barred by the doctrine of *res judicata* and must be dismissed. This determination does not, however, end the Court's inquiry since PSC's commissioners— who were not parties to *Niagara v. PSC*—are named as defendants herein in their individual capacities.

## 6. Eleventh Amendment

█ PSC argues that the Eleventh Amendment [53] bars this Court from adjudicating Niagara's claims against it in federal court. *See Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 54–57, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996) (states' sovereign immunity from suit in federal court defeated only if state consents to suit or Congress unequivocally abrogates immunity pursuant to valid exercise of power). In *NYSEG*, the plaintiff utility argued that the Eleventh Amendment did not bar a claim against PSC because the state had waived its immunity by voluntarily implementing PURPA. The Court rejected this argument [54] and expressly declined to consider NYSEG's alternative invocation of the exception to sovereign immunity carved out by the Supreme Court in *Ex Parte Young*, [55] because it ultimately held

**53.** The Eleventh Amendment provides:
 The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.
 U.S. CONST., amend. XI.

**54.** Indeed, this Court noted:
 Constructive consent is not a doctrine commonly associated with the surrender of constitutional rights." *College Sav.Bank*, 527 U.S. at 681, 119 S.Ct. 2219 (quoting *Edelman v. Jordan*, 415 U.S. 651, 673, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974)). "True waiver of a constitutional right is demonstrably an 'intentional relinquishment or abandonment of a known right or privilege.' " *Id.* (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938)). "[C]ourts indulge every reasonable presumption against waiver" of fundamental constitutional rights. *Id.* (quoting *Aetna Ins. Co. v. Kennedy ex rel. Bogash*, 301 U.S. 389, 393, 57 S.Ct. 809, 81 L.Ed. 1177 (1937)).

The Supreme Court has expressly held that a state's participation in or agreement to administer a federal program does not constitute waiver of Eleventh Amendment immunity. *See Florida Dep't of Health & Rehab. Servs. v. Florida Nursing Home Assoc.*, 450 U.S. 147, 150, 101 S.Ct. 1032, 67 L.Ed.2d 132 (1981) (state's participation in federal Medicaid program through which federal government provides assistance for operation by state of system of public aid and agreement to abide by federal law in doing so is not sufficient to establish consent on part of state to be sued in federal courts). Thus, the Court rejects NYSEG's contention that New York waived its sovereign immunity against being sued in federal court by agreeing to implement PURPA. *NYSEG*, 117 F.Supp.2d at 250.

**55.** There, the Supreme Court held that the Eleventh Amendment was not a bar to enjoining individual state officials from continuing to commit unconstitutional acts. *See* 209 U.S. 123, 159, 28 S.Ct. 441, 52 L.Ed. 714 (1908).

that Eleventh Amendment immunity did not shield PSC from NYSEG's Supremacy Clause claim. 117 F.Supp.2d at 251 (citing *Burgio & Campofelice, Inc. v. New York State Dep't of Labor,* 107 F.3d 1000, 1006–07 (2d Cir.1997) (no Eleventh Amendment bar to suit by contractor to enjoin New York State Department of Labor from enforcing state's prevailing wage law on basis of federal pre-emption via ERISA where plaintiff sought only to prevent state from enforcing its own regulations in area of exclusive federal jurisdiction)). In this case, because Niagara's claims against PSC are precluded based on the principle of *res judicata,* the Court will address the Eleventh Amendment defense in the context of claims against PSC's individual commissioners based on alleged violation of PURPA.

The foregoing is not an issue of first impression. In *North Am. Natural Res., Inc. v. Michigan Pub. Serv. Comm'n ("North Am."),* 41 F.Supp.2d 736, 741 (W.D.Mich.1998), the court held that the Eleventh Amendment did not bar the plaintiff cogenerators' claims against state public service commissioners for allegedly violating PURPA by restructuring QF contracts based on *Ex Parte Young.* "[W]here a state officer's actions are violating or will violate federal law, those actions are outside the state's authority and '[t]he state has no power to impart to

him any immunity from responsibility to the supreme authority of the United States.'" *North Am.,* 41 F.Supp.2d at 741(quoting *Ex Parte Young,* 209 U.S. at 160, 28 S.Ct. 441). "Under this exception to immunity, jurisdiction exists for prospective injunctive relief to enjoin ongoing violations by state officials of federal law." *Id.* (citing *Seminole,* 517 U.S. at 73, 116 S.Ct. 1114). As discussed above in connection with PSC's arguments regarding statute of limitations, the Court questions whether Niagara has sufficiently alleged any "ongoing" constitutional harm. However, the Court declines to reach a different conclusion than the Western District of Michigan concerning the *Ex Parte Young* exception to PURPA claims against state regulatory authority commissioners sued in their official capacity. Thus, defendants' motion to dismiss Niagara's complaint against PSC's commissioners based on the Eleventh Amendment must be denied.

### 7. *PSC's Power to Alter Existing QF Contracts*

■■■ Relying on *Freehold,* defendants assert that PURPA pre-empts PSC from altering previously approved contracts. *See* 44 F.3d at 1190. The Court agrees with this argument just as it did in *NYSEG.*[56] Niagara attempts to distinguish

---

**56.** There, this Court stated:

Section 210(c) of PURPA required FERC to prescribe rules exempting QF's from the FPA and state utility-type regulation, *see* § 16 U.S.C. § 824a–3(e)(1), which directive FERC fulfilled by promulgating 18 C.F.R. §§ 292.601–292.602, which exempt certain QFs, ... from traditional utility-type regulation. The Third Circuit held that these provisions together with FERC's avoided cost regulations, pre-empt a state regulatory commission from modifying previously approved rates in a PPA to reconcile a significant decline in the utility's avoided costs, the very situation in which NYSEG now

finds itself. *See Freehold,* 44 F.3d at 1192 ("[T]here is specific federal statutory legislation, PURPA, that bars reconsideration of the prior approval of the PPA ...").

And NYSEG's plight is not unique. Since enactment of PURPA, NYSEG is not the only utility which has found itself bound to PPA contracts which obligate it to pay more than avoided costs for purchases. Yet courts which have examined such predicaments have uniformly refrained from trenching upon Congress' explicit intent to advance the development of alternative energy producers, even if at the expense of traditional utilities and even if at the ex-

*Freehold* by arguing that the bar against state commissions revisiting previously approved contracts applies only where the state commission does so in order to implement state laws and regulations. According to Niagara, "PURPA does not bar revision of orders approving existing contracts where the purpose is to comply with PURPA itself." In *NYSEG*, the plaintiff utility argued essentially the same thing— that continuing oversight of QF contracts by a state agency such as PSC is required to comply with PURPA's dictate that state commissions implement PURPA rules which provide that utilities may not be charged more than avoided costs for QF

pense of ratepayers. *See Connecticut Valley*, 208 F.3d at 1045. In *Smith Cogeneration*, the Supreme Court of Oklahoma held that any attempt to revisit a cogeneration contract as a result of changed circumstances deprives QFs of the benefits of their bargain and imposes "utility-type" regulations on them in violation of Congressional intent. 863 P.2d at 1240. Likewise in *IEP*, the Ninth Circuit held that the fact that "prices for fuel, and therefore the Utilities' avoided costs are lower than estimated does not give the State and Utilities the right unilaterally to modify terms of the [PPA.]" 36 F.3d at 858. Indeed, "[f]ederal regulations provide that QFs are entitled to deliver energy to utilities at an avoided cost rate calculated at the time the contract is signed" even if the avoided cost rate in the contract is greater than the utility's avoided cost rate at the time of delivery. *Id.* at 858–59. Once a state regulatory authority approves a PPA on the ground that the rate therein is "consistent with avoided cost," any action by such agency to "reconsider its approval or deny passage of such rates" to a QF is "pre-empted by federal law." *Freehold*, 44 F.3d at 1194.
*NYSEG*, 117 F.Supp.2d at 251.

**57.** Niagara contends it is entitled to modification of both (1) contracts which require it to continue to pay the six-cent rate; and (2) contracts which simply reference an existing "tariff" or filed rate. Niagara insists PSC could accomplish the latter by prospectively changing the tariff rate referred to in the

purchases—and this Court disagreed. "Such a contention stands the concept of QF exemption from rate regulation on its head." *NYSEG*, 117 F.Supp.2d at 252. The Court finds that Niagara's claim that PSC "comply with PURPA" by modifying pre-existing contracts[57] is "exactly the type of regulation from which [the QFs] are immune under Section 210(e) [of PURPA.]" *Id.* (quoting *Freehold*, 44 F.3d at 1192).[58]

It is clear that Niagara can prove no set of facts in support of its causes of action against PSC or its commissioners under either PURPA or the Supremacy Clause

agreements. This, according to Niagara, would not constitute alteration of existing contract terms and thus not implicate *Freehold*. The Court notes Niagara already attempted to persuade PSC that it was entitled to substitute a lower avoided cost filed tariff rate for the statutory six-cent rate in such QF contracts and PSC rejected the suggestion. *See On–Site Generation Proceeding—Niagara Mohawk Power Corp.'s Proposed Buyback Tariff*, PSC Case No. 27574, discussed at p. 114, *supra*. Rather, PSC determined that QFs were entitled to receive the higher of either the filed or six-cent rate. Thus, the Court discerns no meaningful distinction between modifying contract rates from six-cents per kwH and modifying the rates *contemplated* in pre– 1992 amendment contracts to be *at least six cents* based on the unappealed order of PSC in Case No. 27574.

**58.** Indeed, this Court found "no legal basis to conclude that PSC has a continuing obligation to monitor PURPA contracts" or PPA rates after contract approval any more than FERC has a continuing obligation to do so after prescribing regulations designed to "encourage cogeneration." *NYSEG*, 117 F.Supp.2d at 252 (quoting 16 U.S.C. § 824a–3(a)). Further, "because PURPA and FERC's regulations implementing PURPA expressly exempt QFs from state rate regulation, PSC's failure to modify or otherwise interfere with the rates in the Saranac and Lockport PPAs is not a violation of federal law. Rather, such restraint is consistent with PURPA and its regulations in light of *Freehold*." *Id.*

which would entitle it to relief. Thus, these claims are subject to dismissal.

## IV. Conclusion

Based on the foregoing, defendants' motions to dismiss Niagara's complaint pursuant to Fed.R.Civ.P. 12(b) are GRANTED in their entirety.

IT IS SO ORDERED.